**Leelynn J. GORMAN, Plaintiff,**

v.

**WELLS MANUFACTURING CORPORATION,**
**Defendant.**

**No. Civ. 400CV40233.**

United States District Court,
S.D. Iowa,
Central Division.

July 15, 2002.

Jeffrey M. Lipman, Lipman Law Firm, Des Moines, IA, John R. Silko, Bloomfield, IA, for Plaintiff.

Helen C. Adams, Dickinson, Mackaman, Tyler & Hagen, Des Moines, IA, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment. Plaintiff, Leelynn J. Gorman ("Gorman") filed her complaint on May 5, 2000, alleging disability discrimination under both the ADA and the ICRA and sex discrimination under both Title VII and the ICRA. On April 15, 2002, Defendant, Wells Manufacturing Corporation ("Wells") moved for summary judgment on all of Plaintiff's claims.

The motion came on for hearing on June 26, 2002. Defendant was represented by Attorney Helen Adams. Plaintiff was represented by Attorneys Jeffrey Lipman and John Silko. Following the hearing, Plaintiff sought leave to file a supplemental brief, which the Court allowed and has considered. For the reasons discussed below, Defendant's Motion for Summary Judgment is granted.

## I. BACKGROUND

All of Gorman's claims stem from her termination from Wells, which she alleges was motivated by absences which she incurred due to "pregnancy-related illnesses". Gorman was employed at Wells' packaging and distribution center in Centerville, Iowa, from January 20, 1992, until she was terminated on September 25, 1998.[1] Gorman was employed at Wells in 1993, during her first pregnancy. Gorman does not allege any discrimination by Wells in connection with her first pregnancy and leave in 1993 and 1994. The discrimination Gorman claims relates to her second pregnancy, of which she informed Wells in March or April of 1998.

In 1998, the time period relevant to this litigation, Wells had a "no fault" attendance policy in effect. Under this policy, there were no "excused" or "unexcused" absences. Certain absences, such as absences under the FMLA, were not counted under the attendance policy. Wells classified any absence that was arguably related to Gorman's pregnancy as an FMLA absence, as long as Wells had reason to believe that Gorman was unable to work during the period of the absence. Consequently, these absences were not counted under Wells' attendance policy.

Under the attendance policy, as described in Wells' employee handbook, when an employee incurred 42 hours of absence from work, he or she would be subject to "Step 1" of Wells' disciplinary process: a verbal warning. When an employee incurred 52 hours of absence, he or she would be subject to "Step 2" of the disciplinary process: a written warning. At 62 hours of absence, the employee would be subject to "Step 3": a three-day unpaid suspension. Any absences beyond Step 3 would be grounds for termination. In addition, when an employee was absent four or more consecutive days due to illness, Wells required the employee to provide medical authorization in order to return to work.

---

1. Gorman was terminated in February 1992 due to lack of work, but was rehired in March 1992.

Gorman had ongoing attendance problems during her employment at Wells. In the first nine months of 1998, she was absent over 530 hours (approximately 12.5 weeks). Of those 530 hours, 102 (approximately 2.5 weeks) were counted under the attendance policy. Approximately 64 hours of Gorman's chargeable absence resulted from her absence from work from September 14 through September 22, 1998. It is this latter period in September that is at issue in this case.

Gorman alleges that on September 14, 1998, she woke up feeling nauseated and had a headache, which became "excruciating" when she attempted to sit up. She alleges that she began vomiting and felt extremely fatigued, such that she could hardly get out of bed. She alleges that she awoke in this same fashion each morning until September 23, 1998. Gorman asserts that throughout her 1998 pregnancy, she had experienced periodic nausea, vomiting, dizziness, severe headaches, and fatigue. She believes that the symptoms she experienced from September 14 through 22 were all pregnancy-related, but she admitted that at the same time, she was also suffering from allergies and associated sinus problems, which contributed to her "overall malaise". Each morning from September 14 to September 22, 1998, Gorman called in sick, reporting her illness to Wells, pursuant to company policy.

In relation to this period, Gorman saw her physician, Dr. Stephen E. Sparks ("Sparks"), on September 22. Sparks later recalled that he thought Gorman was presenting with a sinus headache. He prescribed amoxicillin "to clean out bacteria in the sinuses". Gorman also asked Dr. Sparks to provide written medical authorization so that she could return to work. Sparks gave her a pre-printed form "Disability Certificate". The form certified that Gorman "was under [Sparks'] professional care from 9/14/98 to 9/22/98

inclusive, and was totally incapacitated during this time". The form further certified that Gorman had recovered sufficiently to be able to return to regular work duties on September 23, 1998, with no restrictions.

After Gorman left his office, Sparks initiated a telephone call to Barb Hunt ("Hunt") in the human resources department at Wells to discuss what was "going on" with Wells (i.e., to see if they could rearrange Gorman's work schedule to part-time hours). With respect to Gorman's absences from work, Sparks recalled that he told Hunt that he guessed he thought Gorman could return to work at that time, that there wasn't any major physical problem such that she couldn't return to work.

Gorman reported to work at her scheduled time on September 23, 1998, and placed the Disability Certificate which Sparks had given her on Barb Hunt's desk. Hunt stated that when she reviewed the form, she believed there was a conflict between the information Sparks had conveyed to her the prior day on the telephone and the Disability Certificate. Hunt had understood what Sparks said on the telephone to mean that Gorman was not unable to work during the period from September 14 through 22. Because she believed that the absences from September 14 to September 22 did not appear to qualify as FMLA absences, at 9:00 a.m. on September 23, 1998, Hunt called Gorman into her office, suspended Gorman from work, and had her escorted out of the building.

To clarify what she believed to be conflicting information between the phone call and the Disability Certificate, Hunt faxed a letter to Sparks summarizing what she thought had been said and asking him to sign it and/or make any corrections he felt

necessary. In pertinent part, the letter stated:

> You informed me that, upon examining Leelynn on September 22, 1998, you did not believe it medically necessary for her to be off work on that day. You further informed me that you told her that while you would provide a note authorizing her return to work only, you could not determine that it was medically necessary for her to be off work at all during the period ... it is my understanding that you were not treating Leelynn for the entire period covered by the form, that you have no information which would lead to the belief that she was medically not able to work during the period from September 14 through September 21, and that in your medical opinion her condition was such that she was not unable to work on September 22, 1998.

Sparks signed the letter, certifying that the information in the letter is correct, and also personally made the following handwritten corrections:[2]

(1) Leelynn has been under our care during her pregnancy.

(2) I do not know of any disabling conditions.

(3) We were first contacted by Leelynn on 9/16 to report that she missed work and needed an excuse to go back to work (unable to follow-up due to phone # change).

(4) She presented on 9/22 asking for coverage from 9/14 through 22, she was given a work excuse to return to work, I affirm that I had not asked her to stay home from work, she had been warned about malingering on 9/8/98.

(5) We would like to see Leelynn commit to equitable work schedule.

Hunt counted the September 14 through September 22 absences under the Wells attendance policy because Wells then had reason to believe that Gorman was *not* unable to work during that period. Deeming the absences as not FMLA-qualifying, and reviewing Gorman's attendance and disciplinary records,[3] Wells terminated Gorman's employment, effective September 25, 1998.

Wells submits that seven other employees at the Centerville plant, excluding Gorman, were pregnant during 1998. All of these seven employees returned to "active" duties following the end of their respective leaves. Three of these employees chose to voluntarily resign after returning to work, all for the stated reason of desiring to remain home with the child. Wells also notes that of the four employees of the Centerville plant, excluding Gorman, that were terminated in 1998, two were female, two were male, and none of these four was pregnant to Wells' knowledge.

## II. STANDARDS FOR SUMMARY JUDGMENT

Defendant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [Defendant] is entitled to judgment as a matter of law". Fed.R.Civ.P. 56(c). "Although we view the

---

2. Sparks now maintains that he stands by his original Disability Certificate, which had indicated that Gorman was "totally incapacitated" from September 14 through 22.

3. Before she had informed Wells of her pregnancy, Gorman was given a three-day unpaid suspension on January 7, 1998, as a result of an incident where she clocked in and then left the building to park her car, contrary to company policy. At that time, she was warned that any further performance issues during the next twelve months could result in termination.

facts in the light most favorable to the non-moving party, in order to defeat a motion for summary judgment, the non-moving party cannot simply create a fact dispute; rather, there must be a genuine dispute over those facts that could affect the outcome of the lawsuit". *Carter v. St. Louis University,* 167 F.3d 398, 401 (8th Cir.1999). "A dispute is not 'genuine' unless the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party." *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1028 (8th Cir.2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"Because discrimination cases often depend on inferences rather than on direct evidence", the Eighth Circuit has cautioned that "summary judgment should seldom be used in employment discrimination cases". *Crawford v, Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994). "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *Whitley v. Peer Review Systems, Inc.,* 221 F.3d 1053, 1055 (8th Cir.2000) (citations omitted); *see also Kellogg v. Union Pac. R. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000) (summary judgment is proper if the employee fails to establish any element of her *prima facie* ADA claim).

### III. LEGAL ANALYSIS

### A. Disability Discrimination

Gorman asserts claims of disability discrimination under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216.6. Gorman predicates these claims on the asserted disability of pregnancy or pregnancy with complications.

### 1. ADA Claim

With respect to both the sex and disability claims, Gorman has the initial burden to establish a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To establish a *prima facie* case of disability discrimination under the ADA, Gorman must establish: (1) that she is disabled under the ADA; (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) that she has suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *E.g., Sprenger v. Fed. Home Loan Bank,* 253 F.3d 1106, 1113 (8th Cir.2001).

If Gorman is able to establish a *prima facie* case of discrimination, the burden shifts to Wells to articulate a legitimate, nondiscriminatory reason for terminating Gorman's employment. *E.g., Nelson v. Wittern Group, Inc.,* 140 F.Supp.2d 1001, 1005 (S.D.Iowa 2001); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing burden-shifting framework). If Wells is able to meet this burden of production, Gorman must be afforded an opportunity to show that Wells' proffered reason was a mere pretext. *Nelson,* 140 F.Supp.2d at 1005; *see also McDonnell Douglas,* 411 U.S. at 802–803, 93 S.Ct. 1817.

### a. Was Gorman "disabled" within the meaning of the ADA?

Under the ADA, "disability" means "a physical or mental impairment that substantially limits one or more major life activity of such individual". 42 U.S.C. § 12102(2)(A). "Physical impairment" means "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the

following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine". 29 C.F.R. § 1630.2(h)(1). The EEOC Technical Assistance Manual advises, "Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments". 29 C.F.R. § 1630.2(h). Moreover, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities". 29 C.F.R. app. § 1630.2(j).

■ Gorman concedes that no court currently maintains that pregnancy *per se* is a disability under the ADA. *See Navarro–Pomares v. Pfizer Corp.*, 97 F.Supp.2d 208, 212 (D.P.R.2000) (noting that no court now maintains that pregnancy per se is a disability under the ADA), *rev'd on other grounds, Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir.2001). However, Gorman argues that pregnancy-related complications can constitute a disability under the ADA. *See Hernandez v. City of Hartford*, 959 F.Supp. 125 (D.Conn.1997) (premature onset of labor that could only be controlled with medication constituted a disability); *Gabriel v. City of Chicago*, 9 F.Supp.2d 974 (N.D.Ill.1998) (back pain, stomach pain, swelling, and premature birth constituted "physical impairments"); *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95C3834, 1997 WL 106257, at *6 (N.D.Ill. Feb. 10, 1997) (incompetent cervix causing danger of pre-term labor constituted disability under ADA); *Patterson v. Xerox Corp.*, 901 F.Supp. 274 (N.D.Ill.1995) (severe pregnancy-related back pain constituted disability); *Darian v. Univ. of Mass. Boston*, 980 F.Supp. 77 (D.Mass.1997) (severe pelvic bone pain, uterine contractions, irritation and pain of uterus, and back pain constituted disability); *Cerrato v. Durham*, 941 F.Supp. 388 (S.D.N.Y.1996) (denying motion to dismiss ADA claim when

the plaintiff suffered from spotting, leaking, cramping, dizziness, and nausea); *see also Conley v. United Parcel Service*, 88 F.Supp.2d 16, 20 (E.D.N.Y.2000) (holding that it is the physiological impairment that results from complications that renders the person disabled and holding that miscarriage without resultant complications did not constitute disability).

Wells counters that the majority of federal courts hold that absent unusual circumstances, pregnancy-related medical conditions do not constitute a disability. *See Muska v. AT & T Corp.*, No. 96C5952, WL 544407, at *9 (N.D.Ill. Aug. 25, 1998) (temporary fetal distress did not render pregnant employee disabled); *Leahr v. Metro. Pier & Exposition Auth.*, No. 96C1388, 1997 WL 414104, at *2–3 (N.D.Ill. July 17, 1997) (holding that plaintiff's pregnancy-related complications of high blood pressure and gall bladder problems, which were only temporary, did not constitute a disability under the ADA); *Richards v. City of Topeka*, 934 F.Supp. 378, 382 (D.Kan.1996), *aff'd*, 173 F.3d 1247, 1250–51 (10th Cir.1999) (granting summary judgment on ADA claim because pregnancy is a physiological condition, but not a disorder, and as such, pregnancy cannot be called an impairment); *Gudenkauf v. Stauffer Communs., Inc.*, 922 F.Supp. 465, 474 (D.Kan.1996) (holding that typical complications of pregnancy, including morning sickness, do not constitute a disability); *Jessie v. Carter Health Care Ctr., Inc.*, 926 F.Supp. 613 (E.D.Ky. 1996) (employee's pregnancy with no unusual circumstances was not a disability under the ADA); *Tsetseranos v. Tech Prototype, Inc.*, 893 F.Supp. 109 (D.N.H.1995) (holding employee whose pregnancy was complicated by ovarian cysts not disabled); *Kennebrew v. New York Housing Auth.*, No. 01 CIV 1654(JSR)(AJP), 2002 WL 265120, at * 18 n. 32 (S.D.N.Y. Feb. 26, 2002) (granting summary judgment on

ADA claim predicated on gestational diabetes because it was a short-term condition and was not substantial enough to constitute a disability for ADA purposes); *Minott v. Port Auth. of N.Y. & N.J.*, 116 F.Supp.2d 513, 525 (S.D.N.Y.2000) (noting that "only in extremely rare circumstances" will complications arising from pregnancy constitute a disability under the ADA and holding that plaintiff who suffered pregnancy-related complications and miscarried was not disabled); *LaCoparra v. Pergament Home Ctrs., Inc.*, 982 F.Supp. 213, 227 (S.D.N.Y.1997) (holding that in order to qualify as a disability, the complication, "as distinguished from the condition of pregnancy itself, must be substantial enough to qualify as a 'disability', regardless of the fact that the woman is pregnant"); *Johnson v. A.P. Products, Ltd.*, 934 F.Supp. 625, 626–27 (S.D.N.Y. 1996) (neither employee's pregnancy nor its resultant complications constituted disability under ADA); *Villarreal v. J.E. Merit Constructors. Inc.*, 895 F.Supp. 149, 152 (S.D.Tex.1995) (holding that pregnancy and related medical conditions do not, absent unusual circumstances, constitute a physical impairment under the ADA; pregnant employee who miscarried was not disabled under the ADA).

Thus, the majority of federal courts hold that pregnancy-related complications do not constitute a disability under the ADA. In the few cases that have held that pregnancy-related complications constitute a disability, the plaintiffs' symptoms were significantly more serious than Gorman's. Gorman stated in her deposition that the only complication she experienced with her 1998 pregnancy was nausea; however, in her affidavit, she stated that she experienced periodic nausea, vomiting, dizziness, severe headaches, and fatigue. During the period from September 14 through 22, Gorman allegedly experienced nausea, vomiting, and extreme fatigue. The Court regards as common knowledge that all of these symptoms, at some degree of severity, are part and parcel of a normal pregnancy. Even assuming that these additional symptoms constitute "complications" of her pregnancy, they are too short-term to qualify as a disability under the ADA. *See* 29 C.F.R. app. § 1630.2(j) ("[T]emporary non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.").

Thus, even if the Court accepts Dr. Sparks' original Disability Certificate, which certified that Gorman was "totally incapacitated" from September 14 through 22 and disregards his handwritten notations on Barb Hunt's September 22 letter in which he affirmed that he did not know of any disabling conditions which would render Gorman unable to work, Gorman cannot establish that she was disabled within the meaning of the ADA. Further, even if the Court accepts that the symptoms from which Gorman suffered from September 14 through 22 were attributable to a pregnancy-related complication, rather than a normal pregnancy accompanied by the sinus infection, and the Court considers the periodic symptoms which Gorman allegedly experienced throughout her pregnancy, Gorman still cannot establish that she was disabled within the meaning of the ADA. The symptomatic period is just too finite, and Gorman's symptoms too commonly associated with normal pregnancy, to bring her within the protection of the ADA. The Court does not find that Gorman's symptoms constitute the "extremely rare circumstances" wherein pregnancy with complications can predicate a disability claim under the ADA. *See Minott v. Port Auth. of N.Y. & N.J.*, 116 F.Supp.2d 513, 525 (S.D.N.Y.2000) (noting that "only in extremely rare circumstances" will complications arising from pregnancy constitute a disability under the ADA).

The foregoing discussion obviates any concern that Dr. Sparks' apparently changing posture generates a genuine issue of material fact.[4] Assuming the medical facts in a light most favorable to the Plaintiff's position, the necessary threshold is unmet.

### b. Was Gorman qualified to perform the essential functions of her job with or without reasonable accommodation?

To satisfy this element of her *prima facie* case, Gorman "would be required to show that [s]he was 'qualified' in the sense that [s]he was doing h[er] job well enough to rule out the possibility that [s]he was fired for inadequate job performance, absolute or relative". *See Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 290 (8th Cir.1982) (ADEA case), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *see also Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445 (8th Cir. 1998) (applying this standard to ADA cases). As the Eighth Circuit explained in *Halsell,* "The focus of this inquiry, at this point, [i]s not a determination of whether [Gorman] was in fact performing her job adequately, but rather whether there [i]s sufficient evidence of unsatisfactory performance to be a legitimate concern to h[er] employer". *Halsell,* 683 F.2d at 290.

Thus, the inquiry becomes whether Gorman had unsatisfactorily performed her job such that it caused a legitimate concern to Wells. Wells submits that Gorman's attendance problems are enough to cause a legitimate concern. Wells notes that in the first nine months of 1998, Gorman was absent from work for over 530 hours (12.5 weeks), and of those 530 hours,

102 hours (approximately 2.5 weeks) were for absences that were counted under the attendance policy. Wells argues that because it expects its employees to maintain acceptable attendance levels, and because Gorman's 102 hours of chargeable absences were excessive and unacceptable, she was not a "qualified employee" within the meaning of the ADA and ICRA. *See Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 198 (4th Cir.1997) (holding that because employee was "unable to come to work on a regular basis, he was unable to satisfy any of the functions of the job in question, much less the essential ones"); *Moore v. Payless Shoe Source, Inc.,* 139 F.3d 1210, 1213 (8th Cir.1998) (adopting the holding in *Halperin* ); *Nesser,* 160 F.3d at 445 (holding that attendance is a necessary job function and that the plaintiff, who was unable to come to work on a regular basis could not establish that he could perform the essential functions of his job); *Cole v. Staff Temps.,* 554 N.W.2d 699, 705 (Iowa 1996) (recognizing attendance as a necessary job function under the ICRA); *Falczynski v. Amoco Oil Co.,* 533 N.W.2d 226, 231 (Iowa 1995) (same as *Cole* ).

■ The Court finds that Gorman's 102 hours of *chargeable* absences were grounds for Wells to have a "legitimate concern". This is especially true considering the attendance policy, which implements "Step 1" of the disciplinary process at 42 hours of absence, "Step 2" at 52 hours of absence, "Step 3" at 62 hours of absence, and makes any absence after "Step 3" grounds for termination. Gorman's absences far exceed what would be grounds for termination under Wells' attendance policy. Additionally, Gorman

---

4. This factual issue might also be resolved quite apart from the letter drafted by Ms. Hunt on behalf of Wells. Dr. Sparks' own handwritten notes applied to the prepared summary letter are inescapably inconsistent with either his form certificate or his more recently offered opinion that Plaintiff was "totally incapacitated" during the period at issue.

had been warned in January 1998 that any further performance issues in the next twelve months could result in termination. Thus, the Court must find that due to her excessive absenteeism, Gorman was not qualified to perform the essential functions of her job.

### C. Has Gorman suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination?

■ "An inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir.1996); *see also Mercer v. City of Cedar Rapids,* 104 F.Supp.2d 1130, 1144 (N.D.Iowa 2000) (requiring employees identified for comparison to be "similarly situated in all relevant aspects"). Gorman has not offered any "comparison" evidence in the way of similarly situated non-protected class employees who were treated more favorably than Gorman. Gorman claims that in this case, there are no valid "comparators" who are "similarly situated in all relevant aspects" because she is unaware of any employees who made use of their FMLA time as extensively as Gorman. The Court does not find this relevant. Gorman was not terminated for taking FMLA leave; she was terminated for incurring excessive non-FMLA-qualifying

absences. Thus, to raise an inference of discrimination, Gorman would need to point to non-pregnant employees who had 102 hours of absences and a prior suspension and were not terminated. She has produced no such evidence.[5]

The Court finds that Gorman has failed to meet her burden of producing evidence which raises an inference of discrimination. Thus, Gorman has failed to establish every element of her *prima facie* case, and as such, Wells is entitled to summary judgment. *See Kellogg v. Union Pac. R. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000) (summary judgment is proper if the employee fails to establish *any* element of her *prima facie* ADA claim).

■ Even assuming *arguendo* that Gorman was able to establish her *prima facie* case, the Court could find Wells has carried its burden in articulating a legitimate, nondiscriminatory reason for Gorman's termination—excessive absenteeism. Gorman has failed to show that this reason is a pretext. *See Dormeyer v. Comerica Bank–Illinois,* 223 F.3d 579, 583 (7th Cir. 2000) (holding that excessive absenteeism is a valid reason for which to terminate a pregnant employee as long as excessive absenteeism of non-pregnant employees is not overlooked); *see also Kinkead v. Southwestern Bell Tel. Co.,* 49 F.3d 454, 456 (8th Cir.1995) (affirming summary judgment in ERISA retaliatory discharge case where the plaintiff failed to show that

---

**5.** Although it is not its burden, Wells has proffered comparison evidence which supports the contrary inference—that Wells applies its disciplinary policy without regard to pregnancy or sex. Wells notes that seven other employees at the Centerville plant, excluding Gorman, were pregnant during 1998. All of these seven employees returned to "active" duties following the end of their respective leaves. Three of these employees chose to voluntarily resign after returning to work, all for the stated reason of desiring to remain home with the child. Wells also notes that of

the four employees of the Centerville plant, excluding Gorman, that were terminated in 1998, two were female, two were male, and none of these four was pregnant to Well's knowledge. In addition, Wells submits that Gorman's poor attendance record, resultant disciplinary actions, and low performance review evaluations started long before Gorman informed Wells of her 1998 pregnancy. Finally, Wells points to Gorman's 1993 pregnancy while employed at Wells, which resulted in no adverse employment actions.

the employer's proffered reason of excessive absenteeism was pretext).

## 2. ICRA Claim

The Iowa Supreme Court has determined that claims of pregnancy discrimination under the ICRA are treated as sex discrimination claims, not disability discrimination claims. *Wallace v. Osceola Foods, Inc.,* No. 4–98–CV–80563 at 4 (S.D.Iowa Feb. 22, 2000) (order granting summary judgment); *Quaker Oats Co. v. Cedar Rapids Human Rights Comm'n,* 268 N.W.2d 862, 864 (1978); *see also Sahai v. Davies,* 557 N.W.2d 898, 900 ("any classification based on pregnancy is a distinction based on sex").

Even if the Court were to treat this claim as a disability claim, because of the similarity between the ADA and the ICRA's prohibition of disability discrimination, Gorman's claim would fail for the same reasons it would fail under the ADA, *i.e.,* (1) she was not "disabled" for purposes of the ICRA; (2) she was not qualified to retain the job; and (3) she has not established that she was discharged because of the "disability". *See Falczynski v. Amoco Oil Co.,* 567 N.W.2d 447, 449 (Iowa App. 1997) (listing the elements of a *prima facie* case of disability discrimination under Iowa law).

## B. Sex Discrimination

In addition to her disability claims, Gorman also asserts claims of sex discrimination based on pregnancy under Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), and the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216.6.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin". 42 U.S.C. § 2000e–2(a). In 1978, Congress enacted the Pregnancy Discrimination Act ("PDA") to clarify that the terms "because of sex" and "on the basis of sex" included "because of and on the basis of pregnancy, childbirth, or related medical conditions", and that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes....". 42 U.S.C. § 2000e(k); *see also Lang v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir.1997) (explaining the expansion of Title VII to cover pregnancy discrimination).

Similarly, the ICRA states:

> It shall be an an unfair or discriminatory practice for any person to: refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or employee because of the age, race, creed, color, sex, national origin, religion, or disability of such applicant or employee, unless based upon the nature of the occupation.

Iowa Code § 216.6(1)(a). Because of the similarity between federal and state law, Gorman's sex discrimination claims will be addressed together. *See Pioneer Hi–Bred Intern., Inc.,* 946 F.Supp. 1390, 1397 n. 4 (S.D.Iowa 1996) (recognizing that the ICRA is "patterned after Title VII" and noting that "Iowa courts characterize federal case law on Title VII as 'instructive' ") (quoting *Brine v. Univ. of Iowa,* 90 F.3d 271 (8th Cir.1996)).

Under both Title VII and the ICRA, to establish a *prima facie* case of sex discrimination, Gorman must establish that: (1) she was a member of a protected class—pregnant females; (2) she was qualified for her position; and (3) she was discharged

under circumstances giving rise to an inference of discrimination. *E.g., Bergstrom–Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir.1998); *Lang*, 107 F.3d at 1311; *Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 174 (Iowa App.1996).

■ The parties agree that as a pregnant female, Gorman was a member of a protected class. However, Gorman has failed to establish the "qualified" prong of her *prima facie* case. As it did with respect to her ADA claim, Gorman's excessive absenteeism precludes deeming her qualified to perform the essential functions of her job. *See Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) (holding that attendance is a necessary job function and that the plaintiff, who was unable to come to work on a regular basis, could not establish that he could perform the essential functions of his job); *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 231–32 (Iowa 1995) (holding that to establish that he was a qualified employee, plaintiff had to establish that he could perform the essential functions of his job and that his excessive absenteeism under the employer's attendance policy prevented him from performing the essential functions of his job). In addition, because Gorman has failed to meet her burden to produce any evidence that similarly situated non-protected class employees were treated more favorably than she, Gorman has failed to raise an inference of discrimination.

■ Moreover, even if Gorman had established a *prima facie* case of sex discrimination, she has failed to adduce sufficient evidence to create a fact question that Wells' proffered reason of excessive absenteeism was pretextual.[6] *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 717 (8th Cir.2000) ("For a plaintiff to survive summary judgment, she must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions.").

## IV. CONCLUSION

Defendant has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on all of Plaintiff's claims. Accordingly, the Motion for Summary Judgment is **granted.** Defendant has also moved to strike paragraphs 11 through 15 of Plaintiff's affidavit. The Court has reviewed the entire record and has determined on its own which portions of Plaintiff's affidavit should be considered. Therefore, Defendant's Motion to Strike is **denied** as being mooted by the ruling on the motion for summary judgment. The Clerk of Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

---

**6.** In her affidavit, Gorman makes the conclusory allegation that Barb Hunt "tried to manipulate Dr. Sparks into agreeing with her that [she] wasn't ill during the week of September 14 through 22 just as an excuse to fire [her] for taking so much leave". This allegation has no evidentiary basis and is insufficient to support an inference of discriminatory animus, considering the fact that Sparks voluntarily hand wrote on Hunt's letter that he did not know of any disabling conditions and that he had not asked her to stay home from work. *See generally Helfter v. United Parcel Service. Inc.*, 115 F.3d 613 (8th Cir. 1997) (holding employee's conclusory summary judgment affidavit insufficient to withstand properly supported motion for summary judgment).