Wesley HUSINGA, Trustee in Bankruptcy, Plaintiff,

v.

### FEDERAL–MOGUL IGNITION CO., Defendant.

No. 3:06–CV–44.

United States District Court, S.D. Iowa, Davenport Division.

June 15, 2007.

931

Catherine M. Drexler, Gordon R. Fischer, Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, IA, for Plaintiff.

Robert W. Stewart, Lowenbaum Partnership LLC, Clayton, MO, Martha L. Shaff, Betty Neuman & McMahon, LLP, Davenport, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court are the following motions: Defendant, Federal–Mogul Ignition Company's Second Motion for Summary Judgment (Clerk's No. 65) and Plaintiffs Motion for Summary Judgment (Clerk's No. 97). Plaintiff filed a Resistance to Defendant's Second Motion for Summary Judgment on April 18, 2007 (Clerk's No. 96), and Defendant filed a Reply on May 15, 2007 (Clerk's No. 104). Defendant filed a resistance to Plaintiff's Motion for Summary Judgment on May 14, 2007 (Clerk's No. 100) and Plaintiff filed a Reply on June 7, 2007 (Clerk's No. 109)[1]. Plaintiff requested oral argument, however, the Court finds that such argument would not materially aid the resolution of the pending motions. Accordingly, the matter is fully submitted.

## I. PROCEDURAL BACKGROUND

Joseph Canterbury ("Canterbury") filed the present action on September 12, 2005, in the Iowa District Court in and for Des Moines County, Iowa. Defendant removed the matter on October 11, 2005. Jurisdiction is proper under both 28 U.S.C. § 1331 and § 1332. Canterbury's Complaint asserted the following claims; violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.; violation of the Iowa Civil Rights Act ("ICRA"), Iowa Code Chapter 216 et seq.; violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq.; wrongful discharge under Iowa common law; and violation of the Iowa Wage Payment Collection Act ("IWPCA"), Iowa Code Chapter 91A.1 et seq.

On March 3, 2006, this Court entered an Order granting in part and denying in part a Motion to Dismiss filed by the Defendant. *See* Clerk's No. 25. Specifically, the Court granted Defendant's Motion to Dismiss with respect to Canterbury's wrongful discharge claim under Iowa law, concluding that it was fully encompassed and thus, preempted, by Canterbury's fed-

---

**1.** Despite requesting not one, but two extensions of time in which to file a reply to Defendant's Resistance to Plaintiffs Motion for Summary Judgment, Plaintiff's "Reply Brief states:" "After reviewing Federal–Mogul's dense load of excuses, misdirection, and (with all due respect) ignorance of federal law, Undersigned Counsel sees no need to file a Reply Brief." Throughout Plaintiff's pleadings in this case, similar ad hominem remarks are made. *See, e.g.,* Pl.'s Resistance Brief (Clerk's No. 96) at 18 ("Rarely has the undersigned counsel seen a defendant so desperate to keep a set of facts from reaching a jury,"), 25 (stating that Defendant "slyly" fails to point out certain facts and "hides" other facts from the Court), 46 (stating that Defendant's assertion is "Wrong. Completely wrong"), 50, ("Faced with these facts, Defense Counsel swings weirdly and wildly ...."), 51 (stating that a defense argument "completely under-

cuts Defense Counsel's credibility"), 55 ("Wow. Defendant Federal–Mogul is apparently, seriously arguing that 'Plaintiff himself does not believe that his illness(es) were severe enough to keep him from working'...."). At best, these types of comments are uncalled for, and at worst, they rise to the level of unprofessional conduct. *See Sonksen v. Legal Servs. Corp.,* 389 N.W.2d 386, 389 (Iowa 1986) (finding it unprofessional, unethical, and a violation of the Rules of Professional Responsibility to make personally demeaning remarks about opposing counsel, the trial court, and general classes of persons). While the remarks made in this case do not rise to the level of being *"outrageously* unprofessional," as they did in *Sonksen,* counsel is cautioned to refrain from making this type of gratuitous remark in future pleadings in this Court.

eral claims and by his ICRA claim. *See id.* On November 29, 2006, Defendant filed its First Motion for Summary Judgment, arguing that Canterbury lacked standing to assert the claims in the Complaint because he had filed a Chapter 7 Bankruptcy petition after his termination from Defendant's employ, thus giving the Bankruptcy Trustee, Wesley Husinga, exclusive standing to bring Canterbury's claims against the Defendant. In an Order dated April 16, 2007, the Court agreed that Canterbury lacked standing to pursue his claims against Defendant, or to personally benefit therefrom. *See* Clerk's No. 90. The Court, however, declined to grant summary judgment in favor of Defendant on the remaining claims themselves, and instead permitted Canterbury to Amend the Complaint to substitute the Bankruptcy Trustee as the real party in interest in this action. Despite this substitution, the Court will refer to Canterbury throughout this Order as "Plaintiff."

## II. FACTUAL BACKGROUND

Joseph Canterbury was hired by Defendant at its Burlington, Iowa facility on or about October 11, 1999.[2] *See* Pl.'s Resp. to Def.'s Statement of Uncontroverted Ma-

terial Facts at ¶ 1 (Clerk's No. 93).[3] Canterbury did not suffer from any medical conditions relevant to this case at the time he was hired by Defendant. *Id.* ¶ 2. Plaintiff, along with the other production and maintenance employees at Defendant's Burlington facility, are represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW Local Union No. 1237 (the "Union"). *Id.* ¶ 3. Defendant and the Union were parties to a Collective Bargaining Agreement ("CBA") covering the period March 16, 1998 through March 10, 2001 (the "1998 Union Contract").[4] *Id.* at ¶ 4, Article V of the 1998 Union Contract, entitled "Seniority" and § 5.4(e) thereof provides: "An employee shall lose his seniority and his employment will be terminated if . . . he fails to apply for a leave of absence by the end of seven (7) calendar days of absence, unless substantiating circumstances make application impossible."[5] *Id.* at ¶ 5. Article XIV of the 1998 Union Contract, entitled "Leaves of Absences" and § 14.3 thereof provides:

> Leaves which qualify as a leave under the Family Medical Leave Act of 1993

2. Defendant is a $6.3 billion global supplier of vehicle parts with 45,000 employees located in 35 countries, and dozens of locations across North America. One such location, the Burlington, Iowa plant, has approximately 500–525 employees, Def.'s Resp. to Pl.'s Statement of Uncontroverted Facts in Supp. of Pl.'s Mot. for Summ. J. at ¶¶ 1–2 (Clerk's No. 100). Plaintiffs Statement of Uncontroverted Material Facts appears at Clerk's Number 94. Because the Defendant's response to that pleading restates each fact alleged before admitting or denying such, the Court will cite to the Defendant's pleading, but will refer to it hereinafter as "Plaintiffs Statement of Material Facts."

3. Defendant's Statement of Uncontroverted Material Facts appears at Clerk's Number 65.2. Because the Plaintiffs response to that

pleading restates each fact alleged before admitting or denying such, the Court will cite to the Plaintiff's pleading, but will refer to it hereinafter as "Defendant's Statement of Material Facts."

4. While Plaintiff actually denies this statement of fact, it appears that the denial is meant to be a qualification. Specifically, Plaintiff asserts that there was more than one "Union Contract" governing Defendant's Burlington plant, i.e., a Plant Attendance Policy.

5. Plaintiff denies this statement of fact "to the extent this provision clearly conflicts with the other Union Contract, the Plant Attendance Policy." The Plant Attendance Policy and its relationship to the Union Contract will be discussed later in this Order.

shall be provided in accordance with the provisions of the Act. Such leaves may be granted, for good cause, including any extensions thereof, for a period not to exceed a total of twelve (12) weeks, including disability.

*Id.* at ¶ 6.[6] Plaintiff received a copy of the 1998 Union Contract, containing the "Seniority" and "Leaves of Absences" provisions on or about the date of his hire. Plaintiff believes that he read the 1998 Union Contract.[7] *Id.* at ¶ 8.

Defendant and the Union were also parties to a CBA covering the period from March 11, 2001 through March 12, 2005 (the "2001 Union Contract"). *Id.* at ¶ 9.[8] Article V of the 2001 Union Contract and § 5.4(e) thereof provides:

An employee shall lose his seniority and his employment will be terminated if . . . he fails to apply for a leave of absence by the end of seven (7) calendar days of absence, unless substantiating circumstances make application impossible. The seven (7) day period begins with the first day of absence from scheduled work and ends at the end of the employee's regular shift on the seventh calendar day. Application within the seven (7) day period shall be made to the Human Resources Department during regular business hours. Application within the seven (7) day period during non-business hours may be initiated by leaving a voice message on the Human Resources Department phone (ext.374).

*Id.* at ¶ 10.[9] Article XIII of the 2001 Union Contract, entitled "Grievance Procedure," and § 13.1 thereof provides:

The term "grievance" shall mean any misunderstanding, difference or dispute between one or more employees and the Company concerning the violation, interpretation or application of this Agree-

---

6. Plaintiff's response to this Statement of Fact is: "DENY, as Defendant Federal–Mogul Ignition did not follow this policy and plainly violated the FMLA." This response violates the Local Rules on responding to individual statements of material fact. Specifically, Local Rule 56.1(b) provides:

A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

Because Plaintiffs response is an argument rather than a denial as required by the Local Rules, and does not make appropriate references to the record as required by the Local Rules. The Court deems this fact admitted for purposes of summary judgment. Plaintiff's responses to paragraphs 58, 61, 76, 77, and 86 are deemed admitted for the same reason.

7. Plaintiff's response to this statement of material facts is: "DENY, as completely irrelevant. In no way could this ever be considered a *material* fact." (emphasis in original). Plaintiffs response again fails to comply with the Local Rules and is, thus, deemed admitted. Plaintiff makes an identical response 42 more times throughout his responsive pleading to Defendant's Statement of Material Facts, and since each of those responses also fails to comply with the Local Rules, each is deemed admitted. Specifically, paragraphs 11–15, 29–47, 53, 62–64, 67, 75, 79–81, 92, 96–103 are deemed admitted. *See supra* footnote 6.

8. Plaintiff again denies this statement on the basis that another "Union Contract" existed, i.e., the Plant Attendance Policy. The response fails to comply with the Local Rules and is, thus, deemed admitted. *See supra* footnote 6.

9. This fact is again deemed admitted under Local Rule 56.1, *see supra* footnote 6, as Plaintiff's denial simply qualifies the statement with the asserted existence of the Plant Attendance Policy.

ment, the National Agreement, or supplements to either of them, and such dispute shall be handled in the following manner.... It is agreed by the Union and the Company that the provisions of this Article will be followed to arrive at a solution to any misunderstanding, difference or dispute. Any action contrary to this Article as well as Article XII shall result in appropriate disciplinary action.

*Id.* at ¶ 14. The grievance procedure is further outlined in §§ 13.1.2, 13.1.3, and 13.1.4 of Article XIII of the 2001 Union Contract:

13.1.2 *Step 1.* An employee, or one designated member of a group of employees, having a grievance may request the Supervisor to call the appropriate Steward to handle a specified grievance with the supervisor. The Supervisor will send for the Steward without undue delay, and thereafter, the employee, the Steward and the Supervisor shall attempt to adjust the grievance. The verbal answer of the Supervisor shall be given within twenty-four (24) hours.

13.1.3 It is understood and agreed, however, that the individual employee or the designated member of a group of employees shall have the right at any time to present grievances directly to their Supervisor and have such grievances adjusted, without the intervention of the Union, so long as the adjustment is not inconsistent with the terms of this Agreement, and provided further, that the Union is given an opportunity to be present at such adjustment.

13.1.4 If the Supervisor's verbal answer is not satisfactory, the grievance

may be reduced to writing by the Union, signed by the employee, the Steward, and the Supervisor. A written answer shall be given within three (3) working days.

*Id.* at ¶ 15, Article XIV of the 2001 Union Contract, entitled "Leaves of Absences," and § 14.3 thereof, are identical to the Article XIV of the 1998 Union Contract.[10] *See id.* at ¶ 16. Plaintiff received a copy of the 2001 Union Contract, took it home with him, and assumes he read it. *Id.* at ¶ 17.

As referenced above, Defendant also maintained a Plant Attendance Policy. *Id.* ¶ 18. Canterbury received a copy of that policy at the time of his hire. *Id.* ¶ 19. At the time the 2001 Union Contract was adopted, Defendant implemented a Plant Attendance Policy, dated March 11, 2001 (the "2001 Attendance Policy" or the "Plant Attendance Policy"). *Id.* ¶ 20. No orientation was provided to employees regarding this policy. PL's Statement of Material Facts ¶ 8. The 2001 Attendance Policy assesses points for various attendance infractions, and is deemed a "no-fault attendance policy." Def.'s Statement of Material Facts ¶ 21; Pl.'s Statement of Material Facts ¶ 9. Disciplinary action would result after a certain number of points have been accumulated, though points would not be assigned to a worker "for absences which qualify for leaves under the [FMLA]." Def.'s Statement of Material Facts ¶¶ 21–22. The 2001 Attendance Policy does not explain any employee rights or obligations under the FMLA, nor does it mention the ADA or the ICRA. Pl.'s Statement of Material Facts ¶ 9. Regarding absences, the 2001 Attendance Policy provides:

**10.** Plaintiff denies this statement of fact "to the extent this provision clearly conflicts with the other Union Contract, the Plant Attendance Policy." The fact is deemed admitted. *See supra* footnote 6.

When unable to report for work call 753–5401 and the appropriate extension for your department/area leaving the following information: name, clock number, supervisor's name and specific reason for reporting off. Failure to report off will result in two (2) points charged to the employee's record for each day of absence.

Def.'s Statement of Material Facts ¶ 23. Thus, Canterbury always left a message regarding absences on an answering machine and never spoke to a live person. *Id.* ¶ 26.

Ronald Vorwerk[11] signed the attendance policy "for the company" and it is also signed by a representative "for the union." PL's Statement of Material Facts ¶ 12. Vorwerk is unaware of any exceptions made for any employee of Defendant with regard to assigning points for tardiness or absences. *Id.* ¶ 10. The Plant Attendance Policy states: "In all cases of discipline the Company will review the employee's attendance record during the previous twenty-four (24) month period to determine if there are any unusual or mitigating circumstances which should be considered and weighed prior to the decision to discipline," *Id.* ¶ 11. Canterbury assumes that the 2001 Attendance Policy was presented to the Union membership during the ratification meeting for the 2001 Union Contract, and admits that he saw and read the 2001 Attendance Policy. Def.'s Statement of Material Facts ¶ 24. The Plant Attendance Policy was "handed out to employees through their union." PL's Statement of Material Facts ¶ 12.

Between January 31, 2002 and January 15, 2005, Plaintiff was disciplined on six-teen occasions for having violated the Plant Attendance Policy. Plaintiff denies this assertion, but his denial is more appropriately an admission subject to qualification. That is, Plaintiff argues that each of the sixteen disciplinary action forms were filled out by Federal–Mogul management, and none records the reason for Canterbury's absences or lateness. Further, Plaintiff emphasizes that Vorwerk, the person who made the decision to terminate Plaintiff's employment, did not know the reason behind any of the disciplinary actions. As well, Plaintiff states that it is "possible" that one or more of the absences for which he was disciplined were absences for ADA or FMLA qualifying reasons. Regardless, the record clearly demonstrates that such disciplinary actions occurred, and that they ranged from "Counseling Notice" (for the accumulation of eight points), to First and Second "Written Warning[s]," (for the accumulation of ten and twelve points respectively) to a "Final Written Warning & 90 Calendar days probation" (for the accumulation of fourteen points). *See* Def.'s App. at 156–165. Plaintiff never filed a grievance about any of the disciplinary actions in accordance with the grievance procedure in the 2001 Union Contract, nor has he ever contended that any of the disciplinary actions were based upon an inaccurate assessment of points. Def.'s Statement of Material Facts ¶¶ 29–30.

Despite Plaintiffs assertion that Defendant had no written FMLA policy, other than the sparse references thereto articulated above, Plaintiff applied for and was granted FMLA leave on several occasions.[12] The FMLA paperwork signed by

---

**11.** Vorwerk was the Human Resources Manager for the entire Burlington plant in 2005, and his job duties "include[d] all of the aspects of human resources." PL's Statement of Material Facts at ¶ 4. Vorwerk admits that he has not had any specialized training or taken any classes regarding either the ADA or the FMLA. *Id.* ¶ 5.

**12.** Plaintiff applied for and received FMLA leave due to right knee pain for the period

Plaintiff regarding his request for FMLA leave in March 2003 contains the following Note at the top of the front page:

> NOTE: According to the local Collective Bargaining Agreement "The employee shall lose his seniority and his employment will be terminated if he fails to: 1) apply for a leave of absence by the end of seven calendar days of absence unless substantiating circumstances make application impossible. The seven day period begins with the first day of absence from scheduled work and ends at the end of the employee's regular shift on the seventh calendar day. Application within the seven day period shall be made the Human Resources Department during regular business hours. Application within the seven day period during non-business hours may be initialed by leaving a voice message on the Human Resources Department phone."

Def.'s Statement of Material Facts ¶ 35. Plaintiff also applied for and received FMLA leave for the period of September 18 through September 29, 2003, for the period from September 30 through October 1, 2003, for the period from October 1–7, 2003 (due to a possible hernia), for the period from October 1–3, 2003 (for nose surgery), and for the period from November 10–15, 2004 (for cyst removal). *Id.* ¶¶ 36, 38, 40, 42, 46. Each application contained the same Note as appeared on the March 2003 FMLA paperwork. *Id.* ¶¶ 37, 39, 41, 43, 47. Plaintiff applied for, but was denied, FMLA leave for the period from September 28–29, 2004 (for cyst removal), though the Note appearing on

the March 2003 paperwork also appeared on his application for FMLA leave in September 2004. *Id.* ¶ 45. Plaintiff admits that he read the FMLA paperwork before signing it. *Id.* ¶ 35.

Canterbury was diagnosed with Type II Diabetes in March 2000. *Id.* ¶ 48. He has taken three prescription medications for the condition, Amaryl, Atase, and Glucophage, carries glucose tablets with him to help at times when he believes his blood sugar level is low, and monitors his blood sugar levels daily. *Id.* ¶¶ 50, 52. Canterbury is on an 1800 calorie per day diet, is supposed to eat three meals per day, and is not to skip any meals. *Id.* ¶ 51; Def.'s App. at 273 (Canterbury Dep.). He needs to limit his sugar intake and also monitor his carbohydrate intake. Def.'s App. at 273. Despite his limitations, Plaintiff can think of only one occasion when he had to leave work at Federal–Mogul due to low blood sugars, and no occasions when he had to leave work because of high blood sugars. Def.'s Statement of Material Facts ¶ 53; Def.'s App. at 275 (Canterbury Dep.). Plaintiffs diabetes has not, to his knowledge, affected his vision, hearing, speech, breathing, ability to walk, sit, lift, learn, think, concentrate, or maintain daily care routines. Def.'s Statement of Material Facts ¶ 55; Def.'s App. at 260 (Canterbury Dep.). Canterbury does, however, suffer from occasional episodes of high or low blood sugar. When Plaintiff experiences a high blood sugar episode, he is able to recover from it within a half a day "most of the lime." Def.'s App. at 275 (Canterbury Dep.).[13] During a low blood

---

from May 29 through June 8, 2001, for right knee pain for the period from June 8 through June 11, 2001, and due to chest pain for the period from March 28 through April 2, 2003. Def.'s Statement of Material Facts ¶¶ 32–34.

13. Plaintiff claims that Lori Canterbury, his wife, testified that when he has a blood sugar

episode, "[h]e becomes very white, really shaky ... just very sick ... and after that *he's done for the day* .... It just—it puts him completely down, completely out." Pl.'s App. at 187 (Lori Canterbury Dep.) (emphasis added). Mrs. Canterbury, however, gave this testimony regarding what happens to her husband when he gets a *low* blood sugar episode.

sugar episode, he "turns white as a sheet," gets "clammy," his "whole body is shaking," and he feels "miserable and drained and—it ain't good." *Id.* at 273. After getting his blood sugar back up into a normal range, "it feels like I've worked just a ton of hours and you're just—you're just drained.... I end up falling asleep ... for ... at least two hours," *Id.* When asked if he could perform any normal tasks during or after a low blood sugar episode, Plaintiff stated, "Oh, heavens, no. I don't do—I don't do nothing." *Id.* at 274. During a high blood sugar episode, Plaintiff "get[s] agitated easy. You—I don't sweat, but—she says-my wife has said at times I have turned red and it's-it's pretty much the same thing as a low blood sugar, because you still feel like you're drained after you get your blood sugar back down." *Id.* When asked whether he could perform normal tasks during or after a high blood sugar episode, Plaintiff replied, "Not—I can do it quicker than when 1 have the low blood sugar. You can—you feel better sooner than you do a low—I don't have to take a nap. I don't fall asleep or nothing, but after my blood sugar gets down.... You just don't—you don't feel like you can [perform tasks]. It's a ... weird feeling .... You can get back to your regular duties or whatever, after you-quicker when you have high blood sugar, after you get it regulated." *Id.* Plaintiff testified that his diabetes is affected by colds, and that it impedes the healing of cuts and of a broken leg he once

suffered. Def.'s Statement of Material Facts ¶ 56. Canterbury told four of his supervisors about his diabetic condition: Dan Yeager, Bill Blake, Vicki Houseman, and Bert Huntebrinker.[14] *Id.* ¶ 57. None of these individuals told Ron Vorwerk, Defendant's Human Resources Manager, of Plaintiffs diabetes. *Id.* ¶ 58.[15]

On February 9, 2005, Plaintiff appeared at work as usual. Def's Statement of Material Facts ¶ 61. On February 10, 2005, Plaintiff called in before his shift and stated he was taking a "personal day" because he had to take a person to the hospital who had stopped breathing. *Id.* ¶ 62. On Friday, February 11, 2005 and Monday, February 14, 2005, Plaintiff did not come to work as he had prescheduled days of vacation. *Id.* ¶¶ 63, 64. As Plaintiff and his wife checked out of a hotel on February 14, 2005, he began getting stuffy and started coughing and hacking. When he got home, he called the doctor and scheduled an appointment for February 15, 2005 with Dr. Rashid. *Id.* ¶ 65. Sometime before 2:00 p.m. on February 15, 2005, Plaintiff called the absence line, gave his name, clock number, supervisor's name, and shift, and stated that he would not be in to work that day. Def.'s App, at 266 (Canterbury Dep.). Plaintiff does not recall saying what reason he gave for his absence, but emphasizes that it is *"possible"* that he mentioned bronchitis, pneumonia, and blood sugar. *Id.*[16] Plaintiff also called the absence line on February 16,[17] 17,[18] 18,[19]

---

14. Plaintiff claims he told his supervisor's about his condition so that if he had a low or high blood sugar episode, "I just wanted them to know that if I had that, I needed help." Pl.'s Statement of Material Facts ¶ 15.

15. Plaintiff denies this statement "to the extent they [his supervisors] had a legal obligation under the ADA and/or FMLA to do so."

16. At Deposition, the following colloquy ensued;

Q: You said I'm sick, I won't be in today?
A: I—I would assume.
Q: You don't really remember?
A: I don't remember what I said my reason is.
Def's App. at 266.

17. At Deposition, the following colloquy ensued:

Q: Would I be correct in assuming that when you called in, you gave your

19,[20] and 21, 2005.[21] Plaintiff did not call in on February 20, because it was a non-working Sunday. On the morning of February 22, Ron Vorwerk called Plaintiff while he was gone to a doctor's appointment. Def.'s App. at 267–68 (Canterbury Dep.). Plaintiff returned Vorwerk's call when he got home around 10:30 a.m. the morning of February 22, 2005. Vorwerk asked Canterbury what had been going on and brought up the § 5.4(e) provision of the 2001 Union Contract stating that an employee loses his seniority and his employment is terminated if he fails to apply for a leave of absence. Def's App. at 269 (Canterbury Dep.). Vorwerk asked Canterbury "why [he] didn't come in and get FMLA papers" and Canterbury told him "I didn't realize I need[ed] to—I didn't realize I was going to be sick this long. I didn't realize that I was going to be sick. He asked me if I was in a coma, to keep me from coming in to do it. I said, well, no." *Id.* Canterbury told Vorwerk that he "had pneumonia, then they switched it from pneumonia to bronchitis, and the medicine they put [him] on with the pneumonia jacked my blood sugars up and out of control, and I think that's it." *Id.* After citing § 5.4(e), Vorwerk told Canterbury "that he had no choice but to—that [Canterbury] was terminated," *Id.* Plaintiff has not spoken to Vorwerk since that time, and did not discuss his termination with any supervisors, managers, or human resources employees. *Id.* Despite Vorwerk suggesting that he speak with a union representative during the February 22, 2005 phone call, Plaintiff never spoke to a union officer or shop steward about his termination. *Id.* at 270.

When diagnosed with pneumonia on February 15, 2005, Plaintiff was not specifically told by Dr. Rashid to stay home from work. *Id.* at 271; Def.'s Statement of Material Facts ¶ 67. Plaintiff saw Dr. Rashid at some point after February 15, 2005, and Dr. Rashid changed his diagno-

---

name, your clock number, your supervisor's name, and you said I'm sick?
A: Something to that effect, I believe.
Q: Do you have any recollection of exactly what you said?
A: No, because that's when I was really starting to feel bad.
Def.'s App. at 267.

18. At Deposition, the following colloquy ensued:
Q: Would I be safe in assuming that you gave your name, your clock number, your shift, your supervisor's name, and you said I'm sick?
A: Something in that area. I don't really remember what I said, because when I—during that time, I was—I was sick.... I was in bad shape Def.'s App. at 266.

19. At Deposition, the following colloquy ensued:
Q: Would I be safe in assuming that you gave your name, your clock number, your shift, your supervisor's name, and you said I'm sick?
A: Like I said before, I would assume, but I was really sick at that time. I don't know. I don't recall what I said.
Def.'s App. at 266.

20. At Deposition, the following colloquy ensued:
Q: Would I be safe in assuming that you really don't remember what you said on the voice mail message?
A: Pretty much.... I remember calling, but what I said and—I don't know.
Def.'s App. at 266.

21. At Deposition, the following colloquy ensued:
Q; Would I be safe in assuming that you gave your name, your clock number, your shift, your supervisor's name, and you said I'm sick?
A: I was getting better, so I would assume so.
Q: You have no recollection of what you said?
A: Huh—uh.... No.
Def.'s App. at 266.

sis from pneumonia to bronchitis and switched Plaintiff's diabetes medicine. According to Plaintiff, his medication was changed because the pneumonia medication had caused his blood sugars to rise. Def.'s Statement of Material Facts ¶ 74, Again, Dr. Rashid did not discuss with Plaintiff whether or not he should work during his illness. *Id.* ¶ 75. As Plaintiff was feeling better the evening of February 21, he claims that he intended to return to work on February 22, 2005, the day Vorwerk terminated his employment with Defendant. Def.'s App. at 268 (Canterbury Dep.). Plaintiff admits that he was aware of the requirement in the 2001 Union Contract that an employee must apply for a leave of absence to cover absences of seven days, but believed that the policy referred to seven workdays rather than seven calendar days, but does not know why he believed this to be the correct interpretation of the provision. *Id.* at 271–72.[22] Regardless, there is no dispute that Plaintiff was absent for seven consecutive calendar days and that he did not apply for a leave of absence to cover those days from February 15–21, 2005. Def.'s Statement of Material Facts ¶¶ 80–81.

After the February 22, 2005 phone conversation between Canterbury and Vorwerk, Vorwerk followed up by preparing a termination letter, quoting § 5.4(e) of the 2001 Union Contract, and mailed the letter to Plaintiff. *Id.* ¶ 95. Plaintiff never filed a grievance to protest his termination. *Id.* ¶ 96. Vorwerk had terminated five other employees for violating § 5.4(e) of the Union Contracts; Kelly Herrick; Sheri Bundy; Wendy Starr; Steve Welborn; and Kathy Bomia. *Id.* ¶ 97. Vorwerk believed

that the 1998 and 2001 Union Contracts required termination and that neither Canterbury nor the five other employees terminated under § 5.4(e) had indicated a reason why applying for a leave of absence would have been impossible. *Id.* ¶ 98. Accordingly, Vorwerk did not believe he had a basis to rescind the terminations.

## III. SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark.*

---

**22.** In response to Defendant's Statement of Material Fact that "Plaintiff knew of the requirement in the 2001 Union Contract that an employee was required to apply for a leave of absence to cover an absence of seven days," Plaintiff denies the statement and says that

"Mr. Canterbury believed the policy referred to *calendar* days." Based on Mr. Canterbury's deposition, however, it appears that "calendar" days should actually be "workdays."

*Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so."). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In the present case, both sides have moved for summary judgment on the Plaintiffs claims. Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am.*

*Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2712 (3d ed.1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Id.* at 921.

Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Township Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." (citations omitted)). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank,* 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.,* 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson,* 182 F.Supp.2d 765, 769 (N.D.Iowa 2001).

## IV. LAW AND ANALYSIS

### A. *Count I—Americans with Disabilities Act; Count II— Iowa Civil Rights Act*

The parties each move for summary judgment on Plaintiff's claim under Count I of the Complaint, arising under the ADA, and on Plaintiff's claim under Count II of the Complaint, arising under the ICRA. Plaintiff essentially claims that he was terminated from his employment with the Defendant because he is diabetic. Plaintiff also claims that he was refused reasonable accommodation by the Defendant.

■ "The ADA requires covered entities, including private employers, to provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship.'" *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a prima facie case under the ADA or the ICRA the Plaintiff must show that: 1) he is disabled within the meaning of the ADA; 2) he was qualified to perform the essential functions of his position with or without accommodation; and 3) he suffered an adverse employment action because of his disability, *Dropinski v. Douglas County, Nebraska,* 298 F.3d 704, 706 (8th Cir.2002).[23]

Once a prima facie case of discrimination is presented "the burden shifts to the em-

---

**23.** "Disability claims under the ICRA are analyzed in accordance with federal standards."

ployer to articulate some legitimate, non-discriminatory reason for its actions." *Christopher v. Adam's Mark Hotels,* 137 F.3d 1069, 1072 (8th Cir.1998); *see also Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (stating that the burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is used to analyze claims brought under the ADA). "If the employer meets this burden, the plaintiff then bears the burden of demonstrating that the employer's stated reason is pretextual for discrimination." *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998) (citing *Christopher,* 137 F.3d at 1072). At all times, the ultimate burden of proving discrimination lies with the plaintiff. *Snow,* 128 F.3d at 1206. Although the prima facie factors and burden shifting model are helpful tools towards identifying unlawful discrimination, the Court is mindful that it "should not confuse the means—*McDonnell Douglas'* three-step process—with the end, which is deciding whether or not an employer illegally discriminated." *Shannon v. Ford Motor Co.,* 72 F.3d 678, 682 (8th Cir.1996); *see also McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817. ("[T]he prima facie case will necessarily vary in different factual situations."). Defendant argues that Plaintiff has failed to present sufficient evidence to establish any of the three prongs of a prima facie case of discrimination. Plaintiff, on the other hand, argues that he has conclusively established a prima facie case of discrimination under the ADA and the ICRA.

1. *Prima facie case.*

a. *Whether Plaintiff is disabled*

"To succeed under the ADA [Plaintiff] must first show that he is 'disabled' within

the meaning of the statute." *Knutson v. Ag Processing, Inc.,* 394 F.3d 1047 (8th Cir.2005). A person is considered "disabled" under the statute if the individual can show either: " '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.' " *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 948–49 (8th Cir.1999) (quoting 42 U.S.C. § 12102(2)). There is no dispute on the record that Plaintiff suffers from Type II diabetes, or that Type II diabetes is a "physical impairment" within the meaning of the relevant statutes. Rather, the only dispute as to this first element of Plaintiffs ADA and ICRA claims is whether Plaintiffs physical impairment, his Type II diabetes, substantially limits one or more of his major life activities.

To show that one is "disabled" under clause (A),[24] it is not enough that an individual suffers from an impairment. The impairment must "substantially limit one or more major life activities." 42 U.S.C. § 12102(2)(A). In order to determine whether an individual is substantially limited in a major life activity, the Court must consider: the nature and severity of the impairment; its duration or anticipated duration; and its long-term impact. *Wood v. Crown Redi–Mix, Inc.,* 339 F.3d 682, 685 (8th Cir.2003) (citing 29 C.F.R. § 1630.2(j)(2); *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir. 2001)). The determination of whether an individual is "substantially limited" is a highly factual inquiry and the evidence to establish the existence of a disability is

*Brunko v. Mercy Hosp.,* 260 F.3d 939, 941 (8th Cir.2001) (citing *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir.1997)).

**24.** Plaintiff does not argue that either clause (B) or (C) are applicable in this case.

based, in large part, upon a plaintiffs own description of his or her impairment. "That the Act defines 'disability' 'with respect to an individual' 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner." *Toyota*, 534 U.S. at 198, 122 S.Ct. 681 (external citations omitted). That being said, the Court must determine whether Plaintiff is "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.20. Here, Plaintiff asserts that his physical impairment substantially interferes with and limits the major life activity of eating.

"Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2($l$) (the EEOC regulations issued to implement Title I of the ADA, *see* 42 U.S.C. § 12116 (requiring EEOC to issue regulations implementing ADA)). Thus, major life activities are those activities that are "of central importance to daily life." *Toyota*, 534 U.S. at 197, 122 S.Ct. 681. Defendant concedes for purposes of summary judgment that eating is a major life activity. Def.'s Br. in Support of Second Mot. for Summ. J. at 6 ("Defendant will assume, *arguendo*, that eating is a major life activity...."). Case law in the Eighth Circuit and in other Circuit Courts of Appeal support the conclusion that eating is a major life activity. *See Land v. Baptist Med.*

*Ctr.*, 164 F.3d 423, 424 (8th Cir.1999) ("We also agree that eating and breathing are major life activities within the contemplation of the ADA."); *see also Fraser v. Goodale*, 342 F.3d 1032, 1040 (9th Cir.2003) ("[W]e agree that [eating] is a major life activity under the ADA."); *Waldrip v. General Elec. Co.*, 325 F.3d 652, 655 (5th Cir.2003) ("We also agree that eating is a 'major life activity.' "); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) ("We also conclude that eating is a 'major life activity' as defined by the ADA.").

 The evidence in the record establishes that Plaintiff is on a doctor prescribed 1800 calorie per day diet. Def.'s App. at 273 (Canterbury Dep.). He must eat three meals per day and must not skip any meals. *Id.* He "can't have any sugar intake" and must watch his carbohydrate intake. *Id.* He takes three prescription medications to help control his diabetes. *Id.* at 259. Plaintiff also must monitor his blood sugar levels with a glucometer.[25] Even when Plaintiff takes his prescription medications and follows his doctor-recommended diet precisely, it is still possible for him to have episodes of high or low blood sugar. *Id.* at 273. Plaintiff urges that average people in the population can and do consume more than 1800 calories per day, may skip meals, may eat sugar, don't need to monitor their carbohydrate intake, don't require three prescriptions medications, don't need to use a glucometer, and don't need to be concerned about low or high blood sugar episodes. Further, Plaintiff contends that when he suf-

---

**25.** In Plaintiff's Brief in resistance to Defendant's Motion for Summary Judgment and in support of his own Motion for Summary Judgment, Plaintiff claims that "every single day, Mr. Canterbury must monitor his blood sugar." The assertion that Canterbury *must* monitor his blood sugar *every day* is not supported by the record. Indeed, Mr. Canter-

bury testified during deposition as follows: "The doctor says I—when my blood sugars are running good, I can do [lest blood with glucometer] once a week, but I do it once every morning, just to make sure my sugars are where they're supposed to be." Def.'s App. at 260–61 (Canterbury Dep.).

fers from a low blood sugar episode, he turns white, sweats, is clammy, shakes, and feels miserable and drained. *Id,* After such an episode, he generally falls asleep for at least two hours and then doesn't do anything because "[y]ou're drained. You're there, but you're not—you're not there." *Id.* at 273–74. During a high blood sugar episode, Plaintiff testified that he feels "weird" and "agitated," sometimes turns red, and feels drained after getting his blood sugar back to a normal level, though he is able to resume normal activities sooner than he is after a low blood sugar episode. *Id.* at 274. Thus, Plaintiff concludes that "[n]o reasonable jury could find Mr. Canterbury is *not* substantially limited in the major life activity of eating" and that "[a]s a matter of law, Mr. Canterbury's diabetes is an impairment which substantially limits the major life activity of eating." Pl.'s Resistance Br. at 22.

The mere fact that Plaintiff's physical impairment *affects* his major life activity of eating, however, does not lead to an automatic conclusion that his diabetes "substantially limits" his major life activity of eating, as defined by the ADA. "Substantially limits" is defined in 29 C.F.R. § 1630.2(j) as follows:

(1) The term substantially limits means:

 (i) Unable to perform a major life activity that the average person in the general population can perform; or

 (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

 (i) The nature and severity of the impairment;

 (ii) The duration or expected duration of the impairment; and

 (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

In support of his claim that his Type II diabetes substantially limits his major life activity of eating, Plaintiff cites several cases wherein he claims courts held that persons suffering from chronic, episodic or dramatic episodes were found disabled under the ADA. In *Otting v. J.C. Penney Co.,* 223 F.3d 704 (8th Cir.2000), Rhonda Otting suffered from epilepsy and despite medication and brain surgery, suffered seizures two to three times monthly. 223 F.3d at 706. Otting's physician placed a restriction on Otting's ability to work, that she not climb ladders until she was seizure free for six months. *Id.* at 707–08. J.C. Penney refused to permit her to return to work while under any restrictions and terminated her employment. *Id.* At the time of her termination, Otting continued to suffer regular epileptic seizures, during which she could not see, hear, speak, walk, or work, and after which she would be lethargic, shaky, and have difficulty concentrating for anywhere from ten minutes to thirty-six hours. *Id.* at 710. The Eighth Circuit Court of Appeals concluded that, at the time of Otting's termination, she was suffering from a physical impairment that substantially limited her major life activities of walking, seeing, and speaking. *Id.* at 710–11.

In the next case cited by Plaintiff, *Shaver v. Independent Stave Co.,* 350 F.3d 716 (8th Cir.2003), the plaintiff suffered from nocturnal epilepsy and had had an opera-

tion in which part of his brain was removed and replaced by a metal plate. 350 F.3d at 719. He was employed and eventually terminated, allegedly on the basis of insubordination, by Salem Wood Products Company. *Id.* The plaintiff asserted that his termination was actually the result of his epilepsy and his operation, and that he had been harassed because of those issues during his employment. *Id.* The Court of Appeals found that, prior to his surgery, the plaintiffs epilepsy caused severe seizures that impaired major life activities such as speaking, walking, or seeing, thus establishing that plaintiff had a "record of such an impairment [a disability], pursuant to 42 U.S.C. § 12102(2)(B)." *Id.* at 720. Additionally, the court found that the plaintiff was "regarded" as disabled in his thinking, and thus qualified as disabled for purposes of the ADA, because there was evidence that some of his co-workers regarded him as "stupid" and "not playing with a full deck" because of his epilepsy and surgery. *Id.* (citing 42 U.S.C. § 12102(2)(B)-(C) (providing that one is disabled within the meaning of the ADA if one is regarded, either accurately or inaccurately, as having a disabling impairment)).

In *EEOC v. Northwest Airlines Inc.*, 216 F.Supp.2d 935 (D.Minn.2002), the final case cited by Plaintiff, an airline required that job applicants pass a pre-placement medical examination prior to hire. 216 F.Supp.2d at 936. Three persons were denied employment with the airline due to medical restrictions arising from diabetes or epilepsy, due to the airline's policy of "categorically screening out insulin-dependent diabetics and anti-seizure medicated epileptics from obtaining employment as ESEs or Aircraft Cleaners." *Id.* The only issue before the district court in the case, however, was whether the EEOC had adequately pleaded disability discrimination. *Id.* at 938–39. The court found that the EEOC had provided adequate notice to the defendant of the claims, as the complaint alleged that certain claimants were rejected for positions with the airline because of their disabilities due to the airline's maintenance of a blanket exclusionary policy and due to the fact that the airline did not individually assess potential employees for the ability to perform work with reasonable accommodations. *Id.* at 939.

Of the three cases cited by Plaintiff, only *Otting* has any relevance to the Court's consideration of the present case.[26] In that case, epileptic seizures that caused severe limitations on speaking, walking, and seeing, were deemed sufficient to satisfy the first element of plaintiffs prima facie ADA case. In *Otting*, however, it was clear that the seizures themselves were not under control at the time of Otting's termination, despite surgery and medication. In *Brunke v. Goodyear Tire and Rubber Co.*, 344 F.3d 819 (8th Cir. 2003), the Eighth Circuit Court of Appeals distinguished *Otting*. In *Brunke*, the

---

**26.** *Northwest Airlines* is inapposite, as the only issue under consideration there was whether the plaintiff had adequately stated a cause of action. At no point did the court reach the merits on the claims. *Shaver* is also distinguishable because the finding that the case was adequate to survive summary judgment was premised on 42 U.S.C. § 12102(2)(B)-(C) (subsection (B) states that disability means "a record of such impairment," while subsection (C) states that disability means "being regarded as having such an impairment."). Plaintiff, here, does not assert that he is disabled under either subsection, but rather that he is disabled within the meaning of § 12102(A) (having "a physical or mental impairment that substantially limits one or more the major life activities of such individual."). Moreover, the holding in *Shaver* relied on the holding in *Otting*, and thus does not add anything to the consideration of the present case beyond the holding in *Otting*.

plaintiff had epilepsy and had a seizure at work in February 1988. 344 F.3d at 820. He was temporarily transferred from his oiler position to a production job on orders of a staff physician. *Id.* Following another seizure at work in November 1989, he was again transferred to a production job. *Id.* In September 1992, based on his personal physician's assessment that Brunke's seizures were under control, he was transferred back to his oiler position where he served without incident until his discharge in December 2000, following several altercations and confrontations with co-workers. *Id.* at 820–21. The Court of Appeals found that there was no evidence connecting Brunke's workplace behavior with his epilepsy, and no evidence that epilepsy substantially limited Brunke's major life activities outside the workplace. *Id.* at 821–22. The court emphasized in reaching this conclusion that Brunke's case was distinguishable from *Otting,* because in *Otting,* the plaintiff's "epileptic seizures were not under control at the time of her termination despite surgery and medication." *Id.* at 822.

Notably, none of the cases cited by Plaintiff deal with an alleged substantial limitation on the major life activity of eating, and none deal directly with diabetes, though there is substantial case law dealing with such issues. In *Orr v. Wal–Mart Stores, Inc.,* 297 F.3d 720 (8th Cir.2002), the Eighth Circuit Court of Appeals emphasized that "a 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." 297 F.3d at 724 (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). In *Orr,* an insulin-dependent diabetic pharmacist was required to inject insulin three times per day and eat a special diet within thirty minutes of the insulin injection. *Id.*

at 722. While he attempted to control his diabetes to the best of his ability, on occasion the diabetes was uncontrolled, causing Orr to suffer from "vision impairment, low energy, lack of concentration and mental awareness, lack of physical strength and coordination, slurred speech, difficulties typing and reading, and slowed performance." *Id.* During his employment as a pharmacist with Wal–Mart, Orr routinely closed the pharmacy for thirty minutes over the noon hour to have an uninterrupted lunch. *Id.* Wal–Mart policy required the pharmacy to remain open during store hours, and Orr was instructed not to close the pharmacy during his lunch break, *Id.* Orr continued to close the pharmacy and was issued a written warning, *Id.* While Orr eventually agreed to abide by the policy, he later expressed concern that his inability to take an uninterrupted lunch break would adversely affect the control of his diabetes. *Id.* at 723. Despite initially following the policy and keeping the pharmacy open, Orr later informed his supervisor that we was "resuming noon lunch breaks away from the pharmacy for the maintenance of his diabetic health." *Id.* Orr's employment with Wal–Mart was terminated. *Id.*

The district court found that Orr was not disabled within the meaning of the ADA. *Id.,* The Court of Appeals affirmed, noting that Orr had "failed to present evidence explaining either how diabetes substantially affects his major life activities or the duration and frequency of any limitation." *Id.* at 724. The appellate court stated that most disabilities, "including diabetes, 'do not have a substantial enough effect on [ ] major life activities'" and that "[h]ealth conditions that cause moderate limitations on major life activities do not constitute disabilities under the ADA." *Id.* (quoting *Berg v. Norand Corp.,* 169 F.3d 1140, 1145 (8th Cir.1999)).

Indeed, in *Weber v. Strippit, Inc.,* 186 F.3d 907 (8th Cir.1999), the Court of Appeals reaffirmed a finding it had previously made that dietary restrictions, in general, are "moderate limitations on major life activities" and "do not suffice to constitute a 'disability' under the ADA" 186 F.3d at 914 (citing *Land,* 164 F.3d at 425 (holding that an individual is not actually disabled where, despite a severe allergic reaction to foods containing peanuts or peanut by-products, she can consume other foods and her physical ability to eat is not in any way restricted)); *see also Kammueller v. Loomis, Fargo & Co.,* 285 F.Supp.2d 1200, 1209 (D.Minn.2003) (plaintiff in renal failure who had to limit the types of foods he ate was not substantially limited in the major life activity of eating because his ability to eat was not restricted), *rev'd on other grounds by* 383 F.3d 779 (8th Cir. 2004); *Kinzer v. Fabyanske, Westra & Hart. P.A.,* No. Civ. 00–855, 2001 WL 1110371, at *3 n. 5 (D. Minn. Sept 19, 2001) ("It is true that Kinzer is required to monitor his blood sugar levels; he cannot eat exactly what he wants, when he wants it; his sleep is disturbed by the fluctuations in his blood sugar levels; and he must be more cautious about his exercise habits. But none of these requirements or limitations amount to a 'substantial limitation' within the meaning of the ADA. Kinzer does eat regular food ... and his need to monitor his blood glucose levels are an inconvenience rather than a limitation.").

Naturally, the determination of whether the limitations on Plaintiffs diet constitute moderate or substantial limitations must be determined in this case, *as* in any other disability discrimination case, on the individualized facts. Using such an approach, some courts have found that extreme dietary restrictions are sufficient to constitute a substantial limitation in the major life activity of eating. For example, in *Lawson v. CSX Transportation, Inc.* 245 F.3d 916, 918, the Seventh Circuit Court of Appeals found that a diabetic was substantially limited in the major life activity of eating when he had to test his blood four to six times per day, administer three insulin injections per day, "stop all other activities" at times when his glucose was low and "take in the kinds of food [to] bring his sugar levels back to normal." 245 F.3d at 918. Further, the record reflected that, even when taking insulin, Lawson's "ability to regulate his blood sugar and metabolize food is difficult, erratic, and substantially limited." *Id.* at 924. The *Lawson* court differentiated the case from Eighth Circuit cases such as *Weber* and *Land,* pointing out that "[i]t is the severity of these limitations on his ability to eat that distinguishes Mr. Lawson's situation from that of other individuals who must follow the simple 'dietary restrictions' that medical conditions sometimes entail." *Id.* at 924–25.

Plaintiff's case can be distinguished from *Lawson.* Unlike Lawson, Plaintiff is Type II diabetic and is not insulin dependent. While he is on a diet that requires him to eat 1800 calories per day, does not permit him to skip meals, and requires him to watch his carbohydrate intake and to avoid sugars, Plaintiff is only required to test his blood sugars with a glucometer once per week and simply estimates his caloric intake. Def.'s App. at 273–74; Pl.'s App. at 131. Though Plaintiff has testified that he suffers from high and low blood sugar episodes, he has provided absolutely no indication as to how frequently or infrequently such episodes occur. Indeed, Plaintiff testified that he has never had to leave work due to a high blood sugar episode, and only ever had to leave work once during his tenure with Defendant due to a low blood sugar episode. The Ninth Circuit, in a case subsequent to *Lawson,* noted that the fact that eating is a major life activity does "not thereby invite all

those on a diet to bring claims of disability." *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir.2003) ("Not every impediment to the copious and tasty diets our waistlines and hearts cannot endure is a substantial limitation on the major life activity of eating.").[27] Taking the evidence in the light most favorable to Plaintiff, the Court cannot conclude that these restrictions constitute a *substantial* limitation on the major life activity of eating. Indeed, the Court finds the limitations imposed on Plaintiffs eating habits due to his diabetes substantially less compelling than the several cases where eating restrictions have been held sufficient to constitute a substantial limitation on eating, generally in the context of an insulin-dependent diabetic. *See, e.g., Branham v. Snow*, 392 F.3d 896, 903–04 (7th Cir.2004) (genuine issue of material fact existed where insulin dependent diabetic was required to measure blood sugar four times per day, and depending on the results, might have to eat immediately, wait to eat, or eat certain types of foods, and where plaintiff was "never free to eat whatever he pleases" and was required to adjust his diet to compensate for exertions, stresses, or illnesses), Likewise, the Court finds Plaintiffs case less compelling than innumerable cases where eating restrictions were held *insufficient* to constitute a substantial limitation on eating, *See Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (the require-

ment of a major life activity being "substantially limited" requires a "significant restriction," not a "mere difference").

For example, in a case factually similar to the present one, David Burrell, an insulin-dependent Type I diabetic, suffered numerous low blood sugar episodes during his employment as an "'upfit' technician customizing engines." *Burrell v. Cummins Great Plains, Inc.*, 324 F.Supp.2d 1000, 1003–04 (S.D.Iowa 2004). After termination from his position, Burrell filed suit under the ADA, arguing that the severity of his diabetes impacted his ability to eat and sleep, plus affected other major life activities. *Id.* at 1012, Rejecting Burrell's argument that Type I diabetes constitutes a per se substantial limitation on major life activities, the court concluded that the fact that Burrell was insulin dependent, had to monitor his blood sugar constantly, and suffered from erratic changes during low blood sugar episodes, did not rise to the level of a substantial limitation on a major life activity. *Id.* at 1014. "The measures Burrell must take to maintain his diabetes, while inconvenient, do not constitute more than moderate limitations on any major life activity." *Id.*, at 1014–15. The court further found that the severe limitations Burrell suffered during a low blood sugar episode (during which Burrell suffered from dizziness, confusion, and mental changes, and limited Burrell's ability to walk, care for himself, or work) were episodic, as the symptoms experi-

---

**27.** The Ninth Circuit found that Fraser was substantially limited in the major life activity of eating because:

> Fraser's diabetes regimen is perpetual, severely restrictive, and highly demanding.... She must vigilantly monitor what and how much she eats. She must time her daily shots and meals so carefully that it is not safe for her to live alone. (She could end up in the ambulance if she took too long a nap between a shot and breakfast.) She must always have certain foods available in case her blood sugar drops or skyrockets.... She cannot put a morsel of food in her mouth without carefully assessing whether it will tip her blood sugars out of balance. She cannot skip or postpone a snack or meal without cautiously studying her insulin and glucagon levels. She must constantly, faithfully, and precisely monitor her eating, exercise, blood sugar, and other health factors, and even this is no guarantee of success.

*Fraser*, 342 F.3d at 1041.

enced during such an episode were temporary and did not affect Burrell all the time. *Id.* at 1015. "Even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity." *Id.* (citing *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir.2001) (finding that weekly epileptic seizures with severe symptoms did not constitute a substantial limitation on a major life activity because holding "that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds")).

As in *Burrell,* the Plaintiff here has offered no evidence of a *substantial* limitation on any major life activity. While Plaintiffs dietary restrictions are certainly an inconvenience, and differentiate him to some extent from persons without diabetes, countless average persons in the general population must endure similar sorts of restrictions. *See Collado v. United Parcel Serv., Co.,* 419 F.3d 1143, 1155 (11th Cir.2005) ("Many people have to monitor their food intake for health and lifestyle reasons, and avoiding 'mostly sugars' is not 'significantly restricted' for this purpose. If it were, all insulin-dependent diabetics would have a 'disability' for ADA purposes, and we know from *Sutton* that they do not." (citing *Sutton,* 527 U.S. at 471, 119 S.Ct. 2139)).

While Plaintiff also attempts to argue that his episodes of high and low blood sugar interfere with other major life activities, such as speaking, walking, and seeing, this fact simply cannot save his claim on the record before the Court. While in cases such as *Otting,* occasional severe manifestations of an illness have been held sufficient to constitute a disability under the ADA, the record here is devoid of evidence as to how frequently Plaintiff suffers from high or low blood sugar episodes.

While Plaintiff describes in detail the effects of such an episode, the record reasonably lends itself to the conclusion that these high or low blood sugar episodes do not occur with significant frequency, as they only precipitated Plaintiff to leave work once in well over five years of employment with Defendant. As in *Brunke,* the record presents no evidence connecting Plaintiff's workplace behavior with his diabetes, and no evidence that diabetes substantially limited Plaintiffs major life activities outside the workplace. Accordingly, the Court concludes that Plaintiff has failed to satisfy the first element of a prima facie case of disability discrimination.

 b. *Was Plaintiff qualified to perform the essential functions of his position with or without accommodation?*

■ Defendant next argues that, even if Plaintiff was disabled within the meaning of the ADA, his claim still must fail because he has failed to satisfy the second essential element of his prima facie case. The second prong of the prima facie case is whether Plaintiff was able to perform the essential functions of his position at Federal–Mogul, with or without reasonable accommodation.

> An essential function may be established by evidence that includes: "(1) the employer's judgment as to which functions are essential"; (2) "written job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs."

*Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 787 (8th Cir.1998) (quoting 29 C.F.R.

§ 1630.2(n)(3)). "A determination of what functions are essential is fact-specific, and 'the inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential.'" *Barnes v. N.W. Iowa Health Ctr.*, 238 F.Supp.2d 1053, 1082 (N.D.Iowa 2002) (citing 29 C.F.R. § 1630.2(n)(2) at App. § 1630.2(n)).

The Eighth Circuit has "consistently held that 'regular and reliable attendance is a necessary element of most jobs.'" *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 777 (8th Cir.2001). Indeed, Defendant's Plant Attendance Policy provides: "The importance of regular and timely work attendance cannot be overemphasized." Def.'s App. at 154. Defendant contends that Plaintiff is unqualified for his position with Federal–Mogul due to excessive absenteeism. Specifically, Defendant points to the fact that Plaintiff was disciplined under the Plant Attendance Policy on sixteen separate occasions. The disciplinary records reflect that Plaintiff was absent and disciplined under the policy on January 31, 2002, December 13, 2003, December 22, 2003, April 30, 2004, May 15, 2004, July 3, 2004, October 1, 2004, January 15, 2005, and January 28, 2005. Plaintiff was tardy and disciplined on March 12, 2003. Plaintiff was disciplined due to "pass-out"[28] on March 27, 2003, May 10, 2003, June 28, 2003, November 7, 2003, and January 28, 2004. On December 11, 2002, Plaintiff was disciplined, though it is unclear whether this was for an absence, tardiness, or "pass-out." Def.'s App. at 97–107. Additionally, Plaintiff took leaves of absences from May 29, 2001 to June 8, 2001 (8 days not counting Saturdays or Sundays); from June 8, 2001 to June 11, 2007 (1 day); from March 28, 2003 to April 2, 2003 (3 days); from September 18, 2003 to September 29, 2003 (7 days); from September 30, 2003 to October 1, 2003 (1 day); from October 3, 2003 to October 12, 2003 (6 days); from September 28, 2004 to September 29, 2004 (1 day); and from November 10, 2004 to November 15, 2004 (3 days). Thus, between May 29, 2001 and January 28, 2005, a period of approximately three and one-half years, Plaintiff was absent or tardy from work on at least 46 days.

Plaintiff attempts to counter Defendant's argument by citing that in his regular written performance appraisals, Plaintiff consistently scored well, and that on all seven evaluations, he was given an overall performance rating of "2"—equivalent to "achievements consistently meet positions's key requirements and objectives." Plaintiff emphasizes that none of the evaluations discuss absenteeism or attendance problems and Vorwerk testified that no plant supervisor ever approached him to complain about Plaintiff in any regard. Plaintiff goes on to argue that since his alleged excessive absenteeism was admittedly not a factor considered in his termination, that Defendant's arguments are "so blatantly phoney" that they go directly to the issue of pretext because they demonstrate that the employer has given shifting and or false reasons for his termination. Pl.'s Br. in Resistance at 28. Plaintiffs argument completely misinterprets the legal requirements of the second prima facie element. The distinction was made clear in a ruling by Senior District Judge Limbaugh of the Eastern District of Missouri:

> Plaintiff spends a considerable amount of her time arguing that the issue of her absenteeism is not material because it was never raised as the reason for defendant's refusal to reinstate her; nor

---

**28.** The record does not delineate what a "pass-out" is.

was regular attendance ever made a condition of reinstatement. Plaintiff totally misses the point raised in the summary judgment motion, The issue of plaintiff's chronic, excessive absenteeism is highly relevant to plaintiffs prima facie case which must first be addressed before any consideration can be given to the merits of the defendant's reason for refusing to reinstate plaintiff. Whether plaintiffs claim is one for wrongful termination or failure to reinstate is immaterial because plaintiff must first make the threshold showing that she is a "qualified individual with a disability who can perform the essential functions of her job, with or without reasonable accommodation." Essentially, plaintiff is arguing that defendant's reason for refusing to reinstate her is pretextual, an issue that can't be addressed until plaintiff first establishes her prima facie case....

[A]n employer is not obligated, under the ADA, to "put up with employees who do not come to work ... [n]or must every company hire replacements for absent employees and call that a reasonable accommodation." *Waggoner v. Olin Corp.,* 169 F.3d 481, 484 (7th Cir. 1999). The ADA does not require an employer to provide a disabled employee with a job but not require that employee to regularly perform it. *Waggoner,* at 484. Finally, defendant is not required, under the ADA, to provide indefinite leaves of absences. An "indefinite leave of absence" is not "reasonable" because it does not enable a disabled person to work and the cost to any employer to pay both the absent worker and replacement worker to fill the same position for an indefinite period of time constitutes an undue burden on the employer. Thus, an indefinite leave of absence is not an "accommodation"....

Plaintiff has failed to demonstrate that she could perform an essential function of the job, namely regular and predictable attendance, with or without an accommodation. She has failed to show any genuine dispute of a material fact over her ability to show up regularly for work. The undisputed evidence shows that Kinnaman failed to meet her burden of establishing that she was "a qualified individual with a disability" either at the time of her initial termination, or at the time defendant refused to reinstate her. Since plaintiff cannot perform an essential function of the job, she is not a qualified individual under the ADA.

*Kinnaman v. Ford Motor Co.,* 79 F.Supp.2d 1096, 1102–04 (E.D.Mo.2000) (internal citations omitted).

Despite Plaintiffs misunderstanding of the applicable federal standards, the Court cannot conclude as a matter of law that Plaintiffs absenteeism was so excessive or beyond reason that he was failing to meet the legitimate expectations of his position with Federal–Mogul. Between January 2002 and January 2005, Plaintiff had sixteen disciplinary actions related to absenteeism, tardiness, or "pass-outs." This averages to less than six incidences per year. Even considering the time that Plaintiff took FMLA leaves of absence, the documented rate of absenteeism is less than fourteen days per year. In all of the cases cited by Defendant, the rate of absenteeism was tremendously higher. *See Pickens,* 264 F.3d at 777 (employee failed to meet essential function of attendance where he chose to take lay-off twenty-nine times from October 1995 to August 1996, "eviscerat[ing] any regularity in his attendance"); *Greer v. Emerson Elec. Co.,* 185 F.3d 917, 921 (8th Cir.1999) (employee not qualified where, exclusive of vacation time, employee missed 67 days of work in 1993, 65 days of work in 1994, and 110

days of work through September 15, 1995); *Buckles v. First Data Res.,* 176 F.3d 1098 (8th Cir.1999) (employee not qualified when in six weeks time he exhausted an entire year's worth of vacation and sick leave and then, over the next two months, continued to have numerous absences); *Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445 (8th Cir.1998) (employee not qualified where absent from work for 43–44 days in 199[4] and 175 days in 1995); *see also Gorman v. Wells Mfg. Corp.,* 209 F.Supp.2d 970, 977–78 (S.D.Iowa 2002) (employee's absences unreasonable when he had 102 hours of chargeable absences and company policy provided that any absence after 62 hours was grounds for termination, and where plaintiff had been warned that further performance issues could result in termination); *Kinnaman,* 79 F.Supp.2d at 1102 (employee unqualified where she worked only 106 days in 1993, 99 days in 1994, 31 days in 1995, and 7 days in 1996).[29]

c. *Adverse employment action because of disability.*

■ With regard to whether Plaintiff has established a prima facie case of discrimination, Defendant finally contends that Plaintiff has failed to present evidence sufficient to support an inference of discrimination. To satisfy the third and final element of a prima facie case, Plaintiff must show:

" 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith,* 387 F.3d at 736 (citing *Thomas v. First*

*Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997)), In the absence of direct evidence, the plaintiff may survive summary judgment with evidence that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Lowery v. Hazelwood Sch. Dist.,* 244 F.3d 654, 657 (8th Cir.2001).
*Simpson v. Des Moines Water Works,* 425 F.3d 538, 542–43 (8th Cir.2005).

Defendant first argues that Ron Vorwerk, the person who made the decision to terminate Plaintiffs employment with Federal–Mogul, was unaware of Plaintiff's alleged disability, i.e., that Plaintiff suffered from diabetes. Plaintiff counters this argument by pointing out that he told several different supervisors that he had diabetes so that each would know that he needed help in the event of a high or low blood sugar episode. Plaintiff argues that the knowledge by his supervisors of his diabetic condition should be imputed to Vorwerk. Plaintiff cites *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 875–77 (9th Cir.1989), in support of this proposition.

In *Kimbro,* the Ninth Circuit Court of Appeals determined that the knowledge by an employee's supervisor of his migraine condition could be imputed to management personnel in a failure to provide reasonable accommodations case, despite the fact that there was no evidence that the manager who made the decision to terminate the plaintiffs employment had actual knowledge of the condition, 889 F.2d at 875. Relying on Washington law and traditional agency principles, the court stated that "it is clear that [management] is bound by [the supervisor's] knowledge of

---

**29.** Defendant also argues that Plaintiff is unqualified for his position with Federal–Mogul because he failed to comply with § 5.4(e) of the 2001 Union Contract. Even viewing this

fact in concert with Plaintiffs absentee rate, the Court cannot say as a matter of law that Plaintiff's absenteeism was so excessive as to make him unqualified for his job.

Kimbro's medical condition [as it was clearly established that the supervisor] not only had authority to receive information regarding Kimbro's medical condition, but also had a responsibility to disclose the nature and severity of [that] condition to ... management." *Id.* at 876.

*Kimbro* has been criticized by other Courts of Appeal. The Eleventh Circuit, for example, has interpreted the ADA's prohibition against discrimination "against a qualified individual with a disability *because of* the disability of such individual" as indicating that "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1183 (11th Cir.2005) (quoting 42 U.S.C. § 12112(a) and *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1262 (11th Cir.2001)). Where an employee claims that an employer's stated reason for firing him is "pretext," defined as "a purpose or motive alleged ... in order to cloak [one's] real intention," the *Cordoba* court noted that it "simply defies logic to argue that [the decision maker's] 'real intention' was to fire [the employee] 'because of' a disability [the decision maker] knew nothing about." *Id.* at 1184. The *Cordoba* court found *Kimbro* inapplicable in a discriminatory discharge case, emphasizing that *Kimbro* was a reasonable accommodations case. *Id.* More importantly, the *Cordoba* court emphasized that while the management in *Kimbro* lacked actual knowledge of Kimbro's disability, "Kimbro's supervisor was aware of his condition and was responsible, under [the company's] own policy, for communicating that information to management, Thus, [the company] was essentially arguing that it could avoid liability because its own internal policies had broken down," *Id.; see also Hedberg v. Ind. Bell Tel. Co., Inc.,* 47 F.3d 928, 932–33 (7th Cir.1995) (concluding that without evidence that the decision maker had knowledge of the disability, the determination to terminate an employee could not have been made "because of that disability, as required by the ADA:" At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee 'because of some other reason'); *Rodriguez v. Mrs. Baird's Bakery,* No., 95-50923, 1997 WL 156989, at *3 (5th Cir. Mar. 25, 1997) ("Rodriguez does not offer summary judgment evidence showing that the supervisor responsible for his termination knew about his diabetes. Rodriguez claims that he had informed two other Mrs. Baird's individuals about his condition and contends that their knowledge should be imputed on the theory of *respondeat superior* to the supervisor responsible for his termination. While *respondeat superior* is a theory used in ADA cases to impute actions of an employee-agent to the employer, it is not proper to equate this with the imputing of knowledge between agents of an employer.... When assessing Rodriguez's [ADA] claim, we are concerned with the knowledge of the supervisor who was responsible for his termination.").

This Court finds *Kimbro* distinguishable and unpersuasive. In the present case, Plaintiff has offered no indication that, as in *Kimbro,* any of his supervisors were subject to a company policy requiring them to share their knowledge of Plaintiff's diabetes with Vorwerk. Further, the Court finds that to establish a prima facie case of discrimination, the record must reflect *some* evidence that the person who actually made the decision to terminate knew of the protected characteristic, in light of the plain language of the ADA prohibiting discrimination against a quali-

fied individual "because of the disability of such individual." 42 U.S.C. § 12112(a). While the Court has been unable to find any other Court of Appeals decision dealing with the matter in the context of an ADA claim, this conclusion is consistent with the requirement of actual knowledge applicable in other types of discrimination cases. *See, e.g., Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 87 (2d Cir.2005) (requiring plaintiff in age discrimination case to "offer evidence indicating that persons *who actually* participated in her termination decision had such knowledge"); *Cariglia v. Hertz Equip. Rental Corp.,* 363 F.3d 77, 85 (1st Cir.2004) (finding that biases of persons who were not the decision-maker in an adverse action are only relevant if the decision-maker relied on information manipulated by that person, or where that person had some actual influence in the decision-making process).

Plaintiff next attempts to argue that Vorwerk was made aware of his diabetes at the time of the termination phone call, and that this raises an inference that the decision to terminate Plaintiff's employment was motivated by a discriminatory animus. Vorwerk's affidavit states the following:

41. Plaintiff was absent from work for seven (7) consecutive calendar days, Tuesday, February 15, 2005 through and including Monday, February 21, 2005.

42. No one ever told me that during Plaintiff's February 15, 2005 through February 21, 2005 absences, Plaintiff ever described being sick in any way, nor did Plaintiff ever mention diabetes, blood sugar, bronchitis or pneumonia.

43. Plaintiff did not submit an application for a leave of absence to cover the absence of Tuesday, February 15, 2005 through Monday, February 21, 2005,

44. By the morning of Tuesday, February 22, 2005, I had learned that Plaintiff had not applied for a leave of absence to cover the absence of Tuesday, February 15, 2005 through Monday, February 21, 2005.

45. I interpreted § 5.4(e) of the 2001 [Union] Contract as requiring me to terminate Plaintiff unless some circumstances made it impossible for Plaintiff to have applied for the leave of absence.

46. I therefore, made the following decision: that Plaintiff was terminated; that I would telephone Plaintiff on the morning of February 22, 2005 to so inform him; that during the phone call, I would ask Plaintiff whether any circumstances made it impossible to have applied for a leave of absence; if Plaintiff told me of such circumstances, and if circumstances could be substantiated, the termination would be rescinded.

47. At the time I made the decisions noted in the previous paragraph, I had no reason to think Plaintiff was diabetic, nor that Plaintiff sometimes experienced trouble with his blood sugars.

48. In making the decision noted above in ¶ 47, I did not consult with [any of the four supervisor's Plaintiff claims to have told about his diabetic condition].

49. On the morning of February 22, 2005, I called Plaintiff's home, spoke with who I believe to be Mrs. Canterbury, learned Plaintiff was not home, and asked her to have Plaintiff call me when he returned home.

50. On Tuesday, February 22, 2005, Plaintiff telephoned me. During this phone conversation, I informed Plaintiff of his termination.

51. At no time during the February 22, 2005 telephone conversation, did Plaintiff mention his diabetes,

52. During the February 22, 2005 telephone conversation, Plaintiff mentioned no circumstances which made it impossible to apply for a leave of absence to cover his February 15, 2005 through February 21, 2005 absence, so I had no reason to rescind the termination decision I had made earlier.

Def.'s App. at 283–84. Plaintiff emphasizes that Vorwerk never used the word "terminate" until after he talked about bronchitis, pneumonia, and blood sugars. Pl.'s App. at 120. Specifically, Plaintiff told Vorwerk: "I had pneumonia, then they switched it from pneumonia to bronchitis, and the medicine they put me on with the pneumonia jacked my blood sugars up and out of control, and I think that's it. And that's when he went on to tell me about this [§ 5.4(e) requirement]." *Id.* at 93. There is no indication anywhere in the record that Plaintiff ever actually mentioned "diabetes" to Vorwerk. Indeed, Vorwerk testified during deposition that Plaintiff never mentioned the word diabetes, and that his reference to blood sugars in the 400s meant nothing to him because he didn't have "any medical training in that. I don't know what it means in the sense that is 400 high, is it low? I don't know." *Id.* at 160 (Vorwerk Dep.). Plaintiff is insistent that Vorwerk was put on inquiry notice that Plaintiff was diabetic when he was told that Plaintiff's "blood sugars were in the 400s." In this Court's previous ruling on Defendant's Motion to Dismiss, it was found that Plaintiff's references in his administrative complaint to blood sugar problems were sufficient to defeat Defendant's Motion to Dismiss because, "[w]hile certainly not synonymous, blood sugar and a diabetic condition are widely known to coexist." *See* Clerk's No. 25 at 6. The legal standard of review on that motion, however, required the Court to "liberally construe the underlying [administrative] charges 'in order not to frustrate the remedial purposes of [the ADA].'" *Id.* (quoting *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir.1988)). Thus, the Court found that Plaintiffs diabetes discrimination claim could proceed because it was "sufficiently like or related to his reference to 'blood sugar' in his administrative claim, such that he reasonably could have expected that the scope of the investigation into the matter would have included investigation into his diabetic condition." *Id.*

When considering Vorwerk's actual knowledge at the time the termination decision was made, however, the standard on summary judgment is not the liberal notice pleading standard applicable to the prior Motion to Dismiss. While Plaintiff claims that his reference to blood sugars in the 400s was adequate to put Vorwerk on notice of his diabetic condition, the fact remains that diabetes is most certainly not the only condition that causes fluctuations in blood sugar levels. *See, e.g.*, http://www.webmd.com/diet/news/20061109/high-blood-sugar-a-global-killer ("High blood sugar is one sign that a person is on the road to diabetes. But it kills many people long before they ever get diabetes.... [O]ne in five deaths from heart disease and one in eight from stroke worldwide are attributable to higher-than-optimum blood sugar."); http:/www.wrongdiagnosis.com/sym/high_blood_sugar_printer.htm (listing eighteen separate medical conditions as possible causes of high blood sugar).

Moreover, Plaintiff has not presented any evidence that would contradict Vorwerk's sworn testimony that he made the decision to terminate Plaintiff on the morning of February 22, 2005, *before* speaking to Plaintiff on the telephone and *before* learning of Plaintiffs medical problems. Indeed, Vorwerk's phone call to Plaintiff was to inform him of the termination decision and to determine if Plaintiff was able to provide "substantiating circumstances" that would have "made application [for a leave of absence] impossible" under § 5.4(e) of the 2001 Union Contract. Because Vorwerk had made the ultimate decision to terminate Plaintiffs employment in accordance with § 5.4(e) *before* speaking to Plaintiff, even assuming that during the conversation Vorwerk learned that Plaintiff had diabetes, there is simply no way to conclude that Plaintiff's employment with Federal–Mogul was terminated *because* of his diabetes. *See Kitchen v. WSCO Petroleum Corp.,* 481 F.Supp.2d 1136, 1147–48 (D.Or.2007) ("[A] plaintiff must bring forward evidence that . . . the decision maker . . . had knowledge of the protected activity at the time of *making the decision* adversely affecting the plaintiff's employment.") (emphasis added); *Sarmiento v. Queens Coll. CUNY,* 386 F.Supp.2d 93, 97 (E.D.N.Y.2005) (finding summary judgment improper where disputed issue of fact existed regarding the decision maker's knowledge of plaintiff's ethnicity "*at the time of the decision mak-*

*ing process*") (emphasis added); *Greer v. Eaton Corp.,* No. 04–941, 2005 WL 1240163, at *4 (D.Minn. May 24, 2005) (declining to find a causal link in retaliation case when evidence showed that decision maker was not aware of protected activity "until after the decision to terminate Plaintiff had been made"); *Soares v. Univ. of New Haven,* 154 F.Supp.2d 365, 373 (D.Conn.2001) (fact that employee was *informed* of termination after revealing medical condition insufficient to defeat summary judgment when *decision* to terminate employment was made prior to discovery of disability). For these reasons, the Court finds that Plaintiff has failed to provide evidence sufficient to support the third element of his prima facie case.[30]

2. *Pretext*

■ Even if Plaintiff had established a prima facie case of discrimination, summary judgment would still be proper on his claims under the ADA and the ICRA because he has failed to demonstrate that Defendant's proffered legitimate, nondiscriminatory reason for his termination was mere pretext. Defendant has consistently claimed that the sole reason for Plaintiff's termination was § 5.4(e) of the 2001 Union Contract, which provided that an employee's employment "will be terminated" if he "fails to apply for a leave of absence by the end of seven (7) calendar days of absence, unless substantiating circumstances make

---

**30.** Defendant also argues that Plaintiff cannot demonstrate a discriminatory animus on the part of Vorwerk because five other non-disabled, non-diabetic employees who violated § 5.4(e) were discharged for failing to apply for a leave of absence before the expiration of seven calendar days. Plaintiff does not even respond to this argument in his Brief in Resistance to the Motion for Summary Judgment. It is true that an inference of disability discrimination may arise, sufficient to satisfy the third prima facie element, when evidence exists that a plaintiff was treated less favorably

than similarly situated non-disabled employees. *See Lowery,* 244 F.3d at 659; *Price v. S–B Power Tool,* 75 F.3d 362, 364–65 (8th Cir. 1996). The "similarly situated" test, however, is not a *requirement* in ADA cases, as it is in some Title VII cases, Rather it is just one of a number of ways that discriminatory animus can be established. The fact that Plaintiff was treated no differently than his non-disabled counterparts, while not dispositive on the third element, however, is certainly a factor that weighs against finding that Vorwerk's decision was motivated by discrimination.

application impossible." This is more than sufficient to satisfy Defendant's burden on the second phase of the *McDonnell Douglas* burden shifting analysis. *See Christopher*, 137 F.3d at 1072 (once a prima facie case of discrimination is presented "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions"). Thus, the burden returns to Plaintiff to demonstrate that "the employer's stated reason is pretextual for discrimination." *Wilking*, 153 F.3d at 873. Plaintiff does not dispute that § 5.4(e) provides that employees "will" be terminated, or that he violated the language of § 5.4(e) by failing to apply for a leave of absence by the end of seven calendar days of absence. Rather, Plaintiff argues that Vorwerk's claim that he had "no choice" but to fire Plaintiff demonstrate pretext, because the language of the 2001 Union Contract conflicts with the language of the "second Union Contract-the Plant Attendance Policy [which] contains much different, much more lenient language about absenteeism." Pl.'s Resistance Br. at 39–40.

The Court first notes that Plaintiff gives unwarranted emphasis to the notion that pretext is demonstrated by Vorwerk's assertion that he had "no choice" but to terminate Plaintiffs employment. The relevant portion of the legitimate non-discriminatory reason for Plaintiffs discharge, as proffered by Defendant, is not that Vorwerk had "no choice" in the termination decision, but rather than Plaintiff was discharged pursuant to § 5.4(e) of the 2001 Union Contract. "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (en banc), The question on the analysis of pre-

text is not whether Defendant's decision was unwise, unprofessional, or unfair, but whether Defendant's stated reason for Plaintiffs termination is false such that it is nothing more than mere pretext for discrimination. *See id.; Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir.2005) ("[Plaintiff] seeks to invoke the appellate powers of this court not to right a discriminatory wrong, but to review the fairness of Target's policies.... This, of course, we cannot do.").

There is no dispute that the Plant Attendance Policy provides for a point system resulting in progressive disciplinary actions for certain types of absences from work. There is, likewise, no dispute that the Plant Attendance Policy provides: "In all cases of discipline the Company will review the employee's attendance record during the previous twenty-four (24) month period to determine if there are any unusual or mitigating circumstances which should be considered and weighed prior to the decision to discipline." *See* Pl.'s App. at 200. Plaintiff argues that the two provisions conflict and that Vorwerk could "just have easily relied on the [Plant Attendance Policy]" as on § 5.4(e), Plaintiff claims that Vorwerk's failure to even consider the possibility demonstrates his discriminatory intent. Pl.'s Resistance Br. at 33. The Court disagrees.

Despite Plaintiffs vehement and repeated argument that the Plant Attendance Policy and the 2001 Union Contract conflict, they do not. Neither document incorporates or even references the other, implying that each is a freestanding contract dealing only with the matters specifically included therein, The Plant Attendance Policy does not imply that disciplinary actions cannot be taken outside the scope of that policy. Rather it provides that whenever disciplinary action is taken under the Plant Attendance Poli-

cy, review of the attendance record will be conducted. Plaintiff was not terminated under the progressive disciplinary scheme articulated in the Plant Attendance Policy. He was not disciplined for accumulating too many points thereunder. This is completely separate and distinct from the provision in the 2001 Union Contract providing that employees "will be" terminated for failing to apply for a leave of absence under the conditions articulated in § 5.4(e). The Court cannot see how complying with the provision of the 2001 Union Contract, which is outside the scope of matters discussed in the Plant Attendance Policy, gives rise to any conflict whatsoever. Moreover, as emphasized *supra*, it is not the Court's job to determine whether Defendant made the right decision or made a wise decision. It is the Court's job to determine whether sufficient evidence exists to conclude that the actual reason given for Plaintiff's termination, § 5.4(e), is false, and that Plaintiff was in reality terminated because of his diabetic condition.

■ Even assuming that somehow the two contracts conflict, Plaintiff ignores the fundamental rule of contract interpretation, that "a contract should be construed so as to give effect to all the contract's provisions ... if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in order to avoid rendering either one nugatory." *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 374 (8th Cir.1983). Thus, even reading the two contracts together as one, Plaintiff has failed to identify how the failure of Vorwerk to review his attendance record in accordance with the Plant Attendance Policy would have: 1) made any difference whatsoever in the decision to terminate Plaintiff's employment; and 2) how the failure to take an action

that would have made no difference demonstrates pretext *for discrimination*. Perhaps most importantly, Plaintiffs argument that the failure to choose one contract provision over another demonstrates pretext utterly ignores the meaning of the word "pretext" in the context of a discrimination case. Pretext "means a tie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). The threshold question is whether the employer's "reasons for employment actions are true, not if they are wise, fair or correct." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir.2002) (citing *Wilking*, 153 F.3d at 873). Plaintiff's claim that Vorwerk should have considered evaluating his attendance record under the Plant Attendance Policy does absolutely nothing to discount Vorwerk's assertion that he believed that § 5.4(e) required him to terminate Plaintiff's employment. Even if Vorwerk were incorrect in his interpretation, the fact that he did not consider some other action over the course he ultimately took does not demonstrate that the reason given for the termination decision was not true.

Plaintiff next attempts to argue that Defendant's "shifting explanations" for the reason behind his termination gives rise to an inference of pretext. The Eighth Circuit has held that an employer's offering of a different explanation than that given at the time of termination is sufficient to raise an inference of discrimination. *Young v. Warner–Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir.1998). Defendant has never asserted, however, that Plaintiff was terminated for any reason other than for violation of § 5.4(e) of the 2001 Union Contract. Plaintiffs attempts to twist Defendant's arguments regarding his prima facie case into an alternate explanation for Plaintiffs discharge is entirely frivolous, as discussed *supra*. See *Kinnaman*, 79 F.Supp.2d at 1102–04 ("Plaintiff totally

misses the point raised in the summary judgment motion. The issue of plaintiffs chronic, excessive absenteeism is highly relevant to plaintiff's prima facie case which must first be addressed before any consideration can be given to the merits of the defendant's reason for refusing to reinstate plaintiff").

### B. *Reasonable Accommodation*

■■ To the extent that Plaintiff asserts that Defendant is liable under the ADA or the ICRA for failure to provide reasonable accommodation, his claims under Counts I and II also fail. A different "modified burden-shifting analysis" is applicable to reasonable accommodation cases under the ADA, because the "claims against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive." *Peebles v. Potter,* 354 F.3d 761, 766 (8th Cir.2004). "In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Id.* at 767. "The Act compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts." *Id.* (citing *Kiel,* 169 F.3d at 1136).

■ To establish that Defendant failed to reasonably accommodate him in violation of the ADA, Plaintiff retains the burden of persuasion to make a facial showing on the three elements of his claim, i.e., that he suffered an adverse employment action, that is he is a qualified individual, and that he suffers from a disability. *See Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995). As discussed in detail, *supra,* Plaintiff has failed to demonstrate that he is disabled within the meaning of the ADA.

■ It appears from the record that Plaintiff expected Defendant to "reasonably accommodate" him by "giving him a little (more) time off to get better. That's it." Def.'s Resistance Br. at 49. Though Plaintiff does not articulate it, he must correspondingly have expected Defendant to ignore § 5.4(e) of the 2001 Union Contract mandating that employees who fail to apply for a leave of absence after seven calendar days be terminated. Even if Plaintiffs expectations were reasonable, there is absolutely no evidence in the record that he ever requested such an accommodation from Defendant. 29 C.F.R.App. § 1630.9 provides; "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." "Where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer ... the initial burden rests primarily on the employee to suggest the reasonable accommodations." *Wallin v. Minn. Dep't of Corr.,* 153 F.3d 681, 689 (8th Cir.1998) (quoting *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996)). Nowhere does Plaintiff present evidence, let alone even suggest, that he requested that Vorwerk not apply § 5.4(e) to him or otherwise give him "a little more time off to get better." Indeed, in Interrogatory Number 17 propounded to Plaintiff, Plaintiff states "Plaintiff did not have any discussions with any employee of Defendant regarding reasonable accommodation." Def.'s App. at 244. While Plaintiff goes on to state that "Defendant fired Plaintiff during the period when Plaintiff needed an accommodation," the record reveals, as discussed exhaustively *supra,* that the decision-maker had no knowledge of Plaintiff's claimed disability, and thus could not have had any knowledge of his need for an accommodation. "Only [the plaintiff can] accurately identify the need for accommodations specific to

961

[his] job and workplace. [The plaintiff] cannot 'expect the employer to read [his] mind and know [he] secretly wanted a particular accommodation and [then] sue the employer for not providing it' " *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1218 (8th Cir.1999) (quoting *Ferry v. Roosevelt Bank*, 883 F.Supp. 435, 441 (E.D.Mo.1995)).

Defendant is also correct in its assertion that Plaintiff cannot succeed on a reasonable accommodation theory of recovery because he rejected those reasonable accommodations made by Federal–Mogul. Plaintiff was, as demonstrated by his multiple requests for FMLA leave, well aware of the process for applying for such leave. Likewise, Plaintiff admits that he received and read the 2001 Union Contract containing the requirement that employees apply for a leave of absence. Despite the fact that Defendant made leaves of absences available to its employees, Plaintiff never applied for one, thus rejecting the reasonable accommodation that was made available to him. By statute, reasonable accommodation may include "job restruc-

turing, part-time or modified work schedules...." 42 U.S.C. § 12111(9)(B). Reasonable accommodation may also include "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment." *Wood v. Crown Redi–Mix, Inc.*, 218 F.Supp.2d 1094, 1105 (S.D.Iowa 2002) (citations omitted). Plaintiff had avenues available to accommodate his extended absence from work in February 2005, despite the fact that he never requested an accommodation from his employer. The fact that Plaintiff opted not to pursue any such avenue warrants granting summary judgment on the reasonable accommodation claim in favor of the Defendant.[31]

### C. *Count III—FMLA*

The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Leave may be taken intermittently when medically necessary. *See* 29 U.S.C. § 2612(b)(1). Upon re-

---

**31.** Defendant also argues that the accommodation sought by Plaintiff, i.e., for Defendant to not enforce § 5.4(e) of the CBA, would impose an undue hardship on Federal–Mogul. The Court agrees. The ADA only requires employers to make "reasonable" accommodations to disabled employees. As a matter of law, requiring an employer to contravene a collective bargaining agreement is not reasonable, as it imposes an undue hardship on the employer. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 78, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (concluding in accommodation of religion case that, while "neither a collective-bargaining contract nor a seniority system may be employed to violate [Title VII], we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement"). Plaintiff attempts to argue that "[n]o other person could possibly be affected by providing Mr. Canterbury reasonable accommodation (such as extra leave), despite Section 5.4(e)." Pl.'s

Resistance Br. at 48. The fact that § 5.4(e) deals with seniority issues, however, clearly establishes that other employees' seniority would be directly affected by not requiring Canterbury to comply with § 5.4(e).

The Court also notes that Plaintiff did not even address Defendant's arguments that it is entitled to summary judgment on Plaintiffs reasonable accommodation claim in his Resistance Brief. This alone is sufficient to warrant a grant of summary judgment in favor of Defendant. Moreover, Plaintiff's repeated argument that Vorwerk should have followed the Plant Attendance Policy rather than § 5.4(e) fails to explain how that process would have made any difference in Vorwerk ultimately applying § 5.4(e). Specifically, Plaintiff has not identified any "unusual or mitigating circumstances" in Plaintiff's attendance record that would have changed the decision to terminate Plaintiff for non-compliance with § 5.4(e).

turning from leave, "any eligible employee who takes leave under [§ 2612] for the intended purpose of the leave shall be entitled ... to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C. § 2614(a)(1)(A). The FMLA then prohibits employers from interfering with any right provided under the Act, or from discharging or otherwise discriminating against an employee for opposing any unlawful practice under the same. *See* 29 U.S.C. § 2615(a)(1), (2).

Courts interpreting the FMLA have identified two types of claims under § 2615(a), interference with substantive rights and discriminatory retaliation. *Strickland v. Water Works & Sewer Bd.,* 239 F.3d 1199, 1206 n. 9 (11th Cir.2001). Where, as here, an employee states a claim of interference with a substantive right, an objective test applies, requiring the employee to show, by a preponderance of the evidence, that he was entitled to the benefit denied. *Id.* at 1206–07; *Rankin v. Seagate Tech., Inc.,* 246 F.3d 1145, 1148 (8th Cir.2001) (applying objective test to substantive FMLA claim and rejecting use of traditional burden-shifting analysis for same).

■ 29 U.S.C. § 2612(a)(1)(D) provides that an employee covered by the FMLA is entitled to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." The statute defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves: (A) inpatient care in a hospital, hospice, or residential medical facility; or (B) continuing treatment by a health care provider." 29 U.S.C. 2611(11)(b). Defendant concedes, for the purposes of the present motion that bronchitis, pneumonia, and diabetes may be considered "serious health

conditions" under the FMLA. Defendant urges, however, that Plaintiff has failed to demonstrate that any of those conditions rendered him "unable to perform the functions" of his position, as required by § 2612. This is so because Plaintiffs treating physician never told Plaintiff that he should absent himself from work, and because Plaintiff did not list his illness in February 2005 as a time when he was "unable to work" in response to Defendant's propounded interrogatories:

Interrogatory No. 3

At any time since January 1, 2002 has Plaintiff been unable to work because of injury, illness, or disability? If the answer is in the affirmative, state the inclusive dates during which Plaintiff could not work; fully describe the nature of each such injury, illness or disability; identify the persons who medically treated Plaintiff, and identify all documents relating to the condition and treatment of such injury, illness or disability.

Answer:

See General Objections. Without waiving the foregoing objections, Plaintiff provides the following:

| | |
|---|---|
| 5/29/01–6/11/01 | Right knee pain, Dr. Jochins |
| 3/28/03–4/2/03 | Cardiac catheterization, Dr. Lazar |
| 9/18/03–9/29/03 | Lower back pain, Dr. Rashid |
| 9/29/03–10/01/03 | Abdominal pain, Dr. Tjaden |
| 10/01/03–10/12/03 | Abdominal pain, Dr. Vincent |
| 11/10/04–11/14/04 | Neck surgery to remove cyst, Dr. Menke |
| 9/28/04 | Cyst drainage and open wound, Dr. Menke |

Def.'s App. at 241. The only evidence in the record supporting a conclusion that Plaintiff was "unable to perform the functions of [his] position" are Plaintiffs own statements, and those of his wife, that he was "really sick" during the relevant February 2005 time period. Plaintiff has not provided any testimony or affidavits by Dr. Rashid, the doctor he claims was treating him in February 2005.

29 C.F.R. § 825.115 provides:

What does it mean that "the employee is unable to perform the functions of the position of the employee"?

An employee is "unable to perform the functions of the position" *where the health care provider* finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act (ADA), 42 USC 12101 et seq., and the regulations at 29 CFR § 1630.2(n). An employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment. An employer has the option, in requiring certification from a health care provider, to provide a statement of the essential functions of the employee's position for the health care provider to review. For purposes of FMLA, the essential functions of the employee's position are to be determined with reference to the position the employee held at the time notice is given or leave commenced, whichever is earlier.

*Id.* (emphasis added). The plain language of the regulation indicates that to satisfy the "unable to perform the functions of the position of employee" provision of 29 U.S.C. § 2612(a)(1)(D), Plaintiff must present some evidence that his *"health care provider"* had found that he was unable to work or unable to perform an essential function of his position. Since no such medical evidence is present in the record, summary judgment in favor of Defendant on Plaintiff's FMLA claim is warranted.

 Plaintiff's claim under the FMLA also fails because Plaintiff failed to provide adequate notice to Federal–Mogul of his need for FMLA leave. "A claim under the FMLA cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave." *Woods v. DaimlerChrys-*

ler Corp.,* 409 F.3d 984, (8th Cir.2005). To benefit from the protections of the FMLA statute, an employee must provide his employer with enough information to show that he may need FMLA leave. *Thorson v. Gemini, Inc.,* 205 F.3d 370, 381 (8th Cir.2000) (quoting *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1049 (8th Cir.1999)); 29 C.F.R. §§ 825.302(c), 825.303(b). Though the employee need not reference the FMLA by name, he must provide information to suggest that his health condition could be serious. *Woods,* 409 F.3d at 990–91. Hence, employees have an "affirmative duty to indicate both the need and the reason for the leave," and must let employers know when they anticipate returning to their position. *Sanders v. May Dep't Stores Co.,* 315 F.3d 940, 944 (8th Cir.2003); 29 C.F.R. § 825.302(c).

The FMLA also requires that an employee's notice be timely in order for his leave to be covered by the Act. The statute demands "such notice as is practicable" unless the need for medical leave is foreseeable, when thirty days advance notice must be given. 29 U.S.C. § 2612(e)(2)(B); 29 C.F.R. § 825.303(a). As soon as practicable means "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." 29 C.F.R. § 825.302(b). At a minimum, notice is to be given within "one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Id.* § 825.303(a).

Plaintiff provided no medical notes or certifications to his employer during or after his absence, and indeed, has not presented the Court with any such records. Prior to his termination on February 22, 2005, Plaintiff merely called in "sick" to the company absence line on each business day.[32] While this did comply with the

---

**32.** Plaintiff's argument that it is "possible" that he mentioned pneumonia, bronchitis, or

terms of the Plant Attendance Policy, it was not sufficient to comply with the terms of the FMLA, meaning that summary judgment in favor of the Defendant is proper. *See Woods*, 409 F.3d at 991 (merely indicating to an employer that one is "sick" or "ill" is inadequate notice under the FMLA because it offers "no information to indicate that [the] absence was due to a serious health condition" and no information suggesting when a return to work was likely). Moreover, plaintiff clearly knew of his need for leave as early as February 15, 2005, yet did not give any notice beyond "I'm sick" to Defendant within "one or two working days of learning of the need for leave." Further, Plaintiff has not identified any "extraordinary circumstances" that would demonstrate that informing Defendant of his need for leave was "not feasible" under § 825.303(a). Finally, it is clear that the only time that Plaintiff did present Defendant with even the slightest indication that he was suffering from a "serious health condition" was *after* the decision to terminate his employment had already been made pursuant to § 5.4(e) of the 2001 Union Contract. Plaintiff has not provided any argument or evidence indicating that § 5.4(e) conflicts with the FMLA or diminishes its protections. Hence, Defendant was entirely warranted in complying with the terms of the 2001 Union Contract. *See, e.g., Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir.2005) ("[C]ollective bargaining agreements are only invalidated to the extent they diminish the rights created by the FMLA.").

### D. *Count V—Iowa Wage Payment Collection Act*

Plaintiff does not resist Defendant's Motion for Summary Judgment with regard

to Count V of his Complaint, premised on the Iowa Wage Payment Collection Act. *See* PL's Resistance Br. at 19 ("Mr. Canterbury voluntarily dismisses his IWPCA count."). Accordingly, summary judgment in favor of Defendant is warranted.

## V. CONCLUSION

For the reasons stated herein, Plaintiffs Motion for Summary Judgment (Clerk's No. 97) is DENIED. Defendant's Second Motion for Summary Judgment (Clerk's No. 65) is GRANTED as to Counts I, II, III, and V of Plaintiff's Complaint. The case is dismissed.

IT IS SO ORDERED

---

diabetes during his phone calls to the absence line adds nothing to the analysis, as such testimony is mere speculation and insufficient to defeat a motion for summary judgment. *See*

*Bloom v. Metro Heart Group of St. Louis, Inc.,* 440 F.3d 1025, 1028 ("[S]peculation and conjecture are insufficient to defeat summary judgment.").